**In re Harderison Edward MALLOY, Jr.**

**Harderison Edward MALLOY, Jr., Plaintiff,**

**v.**

**UNITED STATES of America, et al., Defendants.**

**Bankruptcy No. 91–26673–B.**
**Adv. No. 92–2063–B.**

United States Bankruptcy Court,
E.D. Virginia,
Norfolk Division.

Aug. 26, 1992.

Carlene M. Isabella and John J. McNally, Weisberg and Stein, P.C., Norfolk, Va., for debtor.

Daniel G. Bloor, Asst. Atty. Gen., Richmond, Va., for the Com. of Va., ex rel. State Educ. Assistance Authority.

George M. Kelley, III, Asst. U.S. Atty., Norfolk, Va., for the U.S. Dept. of Health and Human Services.

## OPINION AND ORDER REGARDING DISCHARGEABILITY OF DEBT

HAL J. BONNEY, Jr., Bankruptcy Judge.

### STATEMENT OF THE FACTS

How difficult to probe into the inner being! In which we must decide if one is able. Should the debtor repay $90,000 in student loans or is it an undue expectation? We would rather not taste of this cup but must ... and shall.

Harderison Edward Malloy, Jr., debtor, is a nursing home activity assistant residing in Chesapeake, Virginia, who on November 25, 1991, filed a voluntary Chapter 7 petition in the United States Bankruptcy Court for the Eastern District of Virginia at Norfolk. Malloy is a 39 year old unmarried man with no children or financial dependents. However, Malloy presently finds himself indebted to two student loan entities for $90,000. Malloy incurred this large debt during his years in college and medical school when he was forced to borrow money to finance his education.

As of the filing date of his bankruptcy petition, he was indebted to the Commonwealth of Virginia (State Education Assistance Authority) for Virginia Education Loan Authority (VELA) loans in the sum of $26,524.73. Interest accures on this debt at the rate of approximately $160 per month. Malloy was also indebted to the United States of America for Health Education Assistance Loans (hereinafter "HEAL") loans/notes in the sum of $62,759.22. The accrual of interest alone on this debt is approximately $485.70 per month. The United States of America (the Department of Health and Human Services) purchased the HEAL loans on April 7, 1988. Additionally, Malloy owed approximately $7,600 to the United States Department of Education. Interest accrues on this debt at the rate of approximately $25.00 per month. On November 6, 1991, the United States of America filed suit in the United States District Court for the Eastern District of Virginia, Norfolk Division, against Malloy seeking a judgment for the repayment of the HEAL loan indebtedness; however, bankruptcy ensued.

Thereafter, on March 4, 1992, Malloy filed a complaint to determine dischargeability of debt under 11 U.S.C. § 523(a)(8)(A) or (B). Malloy, in his amended complaint, acknowledged that he is indebted to the United States Government, the Commonwealth of Virginia and the United States Department of Education. However, Malloy asserted that the student loan debts should be determined dischargeable pursuant to § 523(a)(8)(A) or (B) of the Bankruptcy Code based on *undue hardship* since he is presently unable and without any hope of a future ability to pay the interest, not to mention repayment of principal, accruing on the debt and also, in order for him to be afforded a fresh start in life.

The United States Department of Education in its answer agreed that Malloy's indebtedness to it is dischargeable. Accordingly, by order of the Court dated June 11, 1992, Malloy's debt owed to the United States Department of Education in the approximate amount of $7,600 was ordered dischargeable.

A trial on the merits was held on August 4, 1992, to determine the dischargeability of the debts Malloy owes to the United States Department of Health and Human Services and the Commonwealth of Virginia. The central issue before the Court is whether the debtor will suffer *undue hardship* if the indebtedness of the student loans is determined nondischargeable.

At trial the following facts were elicited in an effort to show undue hardship. In 1972, Malloy entered Luther Rice College. Soon thereafter Malloy withdrew from the College and entered George Mason University. Malloy also withdrew from George Mason for academic reasons. However, in 1974 Malloy graduated from Northern Virginia Community College with a two year associates degree in general sciences. The next year Malloy entered Virginia Commonwealth University (Richmond) and graduated in 1979 with a Bachelor of Sciences degree in biology. While at Virginia Commonwealth University, Malloy attained an overall grade point average of 2.79 and a grade point average in sciences of 2.40.

Immediately after graduating from college, Malloy attended a summer program for prospective medical students at Eastern Virginia Medical School (hereinafter, "EVMS") and became employed as a microbiologist with the State of Virginia. In 1980 Malloy was admitted to EVMS as a medical student. While at EVMS, Malloy had been given 30 months to complete the 15 month basic science portion of the program. Upon completing the basic sciences portion, Malloy continued with his schooling, but eventually failed three out of four of his medical clerkships. In July of 1983 Malloy voluntarily withdrew from EVMS as a result of unsatisfactory progress in his required medical clerkships. During the period of September 1983 through May 1984, Malloy attended a program specifically designed for medical students with academic difficulties at the Medical College of Virginia. In September of 1984 Malloy was readmitted to EVMS on the condition that he successfully complete a 12 week medical clerkship. However, Malloy failed to successfully complete the course and was required to leave EVMS in December 1984. While at EVMS, Malloy had only successfully completed 15 out of the 36 months required in a three-year medical program.

Two doctors from EVMS testified through depositions concerning Malloy's performance at medical school. Dr. Robert McCombs, Associate Dean for Student Affairs and Admissions, stated that Malloy's problems in medical school included "trouble passing exams and [that] he was performing marginally and at the failing rate and thus was required to repeat most of that first 16 months, which the second time around he did marginally but successfully." Dr. McCombs further stated that he was not aware of any physical, mental, psychological or psychiatric problems that may have affected Malloy's academic progress. Dr. McCombs explained, however, that there was concern about Malloy's "test-taking skills and his ability to work through clinical problems" which involved applying the basic science information that he had learned to patient problems. Dr. McCombs further stated that Malloy was a hard worker but that he was not able to function in the medical school environment.

Dr. Richard Oliver, Assistant Dean for Student Affairs, also testified that other than a stuttering problem, he was unaware of any physical, mental or psychological problems that may have affected Malloy's progress in medical school. In addition, Dr. Oliver stated that although he did believe that Malloy was inclined towards medical school, he did not believe Malloy was adept at becoming a doctor.

In the years subsequent to medical school, Malloy applied for admission to three additional medical schools, but was denied admission. Instead, Malloy was only able to obtain employment at several low-paying jobs, including a part-time job at Sears, Roebuck and Company, a job with the Norfolk City School Board, Lynn Shores Manor, Clearwater Health Service Corporation, and Sentara Nursing Centers in Norfolk and Chesapeake. At the time of filing his bankruptcy petition, Malloy had a gross monthly income of $961.15, a net monthly income of $693.55, and monthly expenses of $683.36 leaving a disposable income of $10.19 per month. Malloy's expenses include a mere $200 a month rent payment, no allotment for clothing and no car or health insurance payment. Malloy has made numerous attempts in the years since he left medical school to secure employment in a job in the medical field or a related field, but has not been successful in

his efforts. Malloy has submitted applications for jobs including several applications for a job as a laboratory technician, epidemiology program representative, sanitarian and a forensic scientist. Malloy has also applied for a job as a counselor in a crisis home and as a resident counselor. In addition, Malloy explored the possibility of becoming an insurance salesman, but was told that he would not make a good salesman. Malloy's efforts to obtain a job have included searching the newspaper for job openings and in the past, registering with the job service of the Virginia Employment Commission, although he is not currently registered. In their rejection letters, several of the employers informed Malloy that they had chosen a more qualified applicant than himself for the various jobs. Since medical school, Malloy's yearly income has fluctuated from approximately $3,700 a year to approximately $11,400 in 1991.

## CONCLUSIONS OF LAW

The debtor, Malloy, seeks to have his student loan indebtedness owed to the Commonwealth of Virginia (State Education Assistance Authority) for Virginia Education Loan Authority (VELA) loans and the United States of America for Health Education Assistance Loans (HEAL) loans declared dischargeable in bankruptcy. The determination of whether Malloy's VELA loan indebtedness should be discharged in bankruptcy is governed by 11 U.S.C. § 523(a)(8). Section 523(a) provides in pertinent part:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless—

(A) such loan, benefit, scholarship, or stipend overpayment first became due more than 7 years (exclusive of any

applicable suspension of the repayment period) before the date of the filing of the petition; or

(B) excepting such debt from discharge under this paragraph will impose an *undue hardship* on the debtor and the debtor's dependents. (emphasis added).

11 U.S.C. § 523(a)(8). Accordingly, the general rule is that educational loans are excepted from a debtor's discharge in bankruptcy. *In re Washington,* 41 B.R. 211, 213 (Bankr.E.D.Va.1984). However, § 523(a)(8)(A) provides for a debtor's educational loans to be discharged if seven years has passed since the loans first became due, excluding any years repayment was suspended. "When the loans first became due is simply a question of fact to be determined from the promissory notes signed pursuant to the student loan agreement." *In re Brown,* 4 B.R. 745, 746 (Bankr.E.D.Va.1980). The parties in the case at bar have stipulated that the VELA loans first became due within seven years of the filing date of Malloy's bankruptcy petition. Therefore, in order to obtain a discharge of his student loan indebtedness, Malloy must prove that he would suffer an "undue hardship" if he were unable to except his educational loans from discharge. 11 U.S.C. § 523(a)(8)(B); *See In re Ballard,* 60 B.R. 673, 674 (Bankr.W.D.Va.1986); *In re Norman,* 25 B.R. 545 (Bankr.S.D.Cal. 1982).

The Bankruptcy Code, however, does not define the term "undue hardship". *In re Ballard,* 60 B.R. at 674. In addition, the legislative history of § 523(a)(8) offers minimal guidance as to what constitutes "undue hardship". *In re Archie,* 7 B.R. 715, 718 (Bankr.E.D.Va.1980). In deciding whether a debtor would suffer "undue hardship" if a student loan indebtedness was declared nondischargeable, " 'the rate and amount of his future resources should be estimated reasonably in terms of ability to obtain, retain, and continue employment and the rate of pay that can be expected.' " 2 Appendix, *Collier on Bankruptcy* p. 140 (15th ed.), quoting the Report of the Commission on the Bankruptcy Laws of the

United States, H.R.Doc. No. 93–137, 93d Cong. 1st Sess., Pts. I and II (1973) quoted in *In re Archie*, 7 B.R. at 718; *In re Andrews*, 661 F.2d 702, 704 (8th Cir.1981). Furthermore, " '[t]he total amount of income, its reliability, and the periodicity of its receipt should be adequate to maintain the debtor and his dependents, at a minimal standard of living within their management capability, as well as to pay the educational debt.' " *Id.* Legislative history indicates that a "case by case analysis" should be used to determine whether the facts of a case are proper to discharge loans based on "undue hardship". *In re Archie*, 7 B.R. at 718; *In re Washington*, 41 B.R. at 215 ("A finding of undue hardship must, turn on the specific facts and circumstances of each case.").

Courts that have had the opportunity to consider the meaning of undue hardship have generally concluded that "a finding of 'undue hardship' requires the presence of 'unique' or 'extraordinary' circumstances which would render it unlikely that the debtor ever would be able to honor his obligations." *In re Love*, 33 B.R. 753, 754–55 (Bankr.E.D.Va.1983); *In re Ballard*, 60 B.R. at 675; *Matter of Rappaport*, 16 B.R. 615, 616 (Bankr.D.N.J.1981). Additionally, " 'undue hardship' means more than an 'unpleasantness' associated with the repayment of educational debt." *In re Love*, 33 B.R. at 755. Furthermore, " 'undue hardship' is not based upon a present inability to pay but rather upon a 'certainty of hopelessness' that future payments cannot be made." *In re Love*, 33 B.R. at 755, *quoting in part In re Lezer*, 21 B.R. 783, 789 (Bankr.N.D.N.Y.1982). "As the Bankruptcy Court noted in *In re Kohn*, 5 B.C.D. 419, 424, 20 C.B.C. 994, 1007 (Bankr.S.D.N.Y. 1979):

'... mere financial adversity without more will not do. There must be present some unique circumstances to render it less likely, or likely only without extreme difficulty, or unlikely at all that the bankrupt will within the foreseeable fu-

ture be able to honor his commitment ... Congress meant the extinguishment of student loans to be an available remedy to those seriously disadvantaged economically as a result of unique factors which are so much a part of the bankrupt's life, present and in the foreseeable future, that the expectation of repayment is virtually nonexistent unless by the effort the bankrupt strips himself of all that makes life worth living.' "

*In re Ballard*, 60 B.R. at 675, *quoting In re Kohn*, 5 B.C.D. at 424. Relevant factors in determining whether a case of "undue hardship" exists include "the debtors' employment status, future earning potential, expenses in relation to income, medical problems or burdensome medical expenses, and other extraordinary expenses as well as the debtors' good faith." *In re Washington*, 41 B.R. at 215. "In short, the judge must not merely consider the current status of the debtor but must look into the future and try to estimate what his future situation will be. Has his education put him in a better position to obtain desirable employment? The court also considers good faith as an element—has the debtor made any effort to try to repay the loan since it first became due?" *In re Littell*, 6 B.R. 85, 88 (Bankr.D.Or.1980).

Additionally, "[t]he beneficial effects of the debtor's educational experience in terms of his employability is relevant to the inquiry into the issue of dischargeability of the student loan for undue hardship."[1] *In re Yarber*, 19 B.R. 18, 20 (Bankr.S.D.Ohio 1982). However, "[t]he obverse should also be a factor." *Id.* As the Court in *In re Littell* explained:

In many cases student loans are granted through a college to students who have little aptitude or chance of succeeding in life. They may be taking a curriculum which will not lead to satisfactory employment. They may be encouraged to take courses, for instance, in education when the market is already overloaded

---

**1.** "The rationale for judicial scrutiny of the extent to which a student debtor benefits from his education is based on equitable considerations. Not only is an ex-student whose earnings income has been substantially increased by this education more likely to repay his loan, but he also is more indebted to the lender on a quantum meruit theory." *In re Yarber*, 19 B.R. at 20.

with teachers, many of whom cannot obtain jobs, but the college professor teaching those classes is in need of more students. If a college were to lose many of its students attending by benefit of student loans, this would be a serious loss to the college as it would represent a substantial diminution of income without a corresponding diminution of expenses. There is great pressure and temptation on the part of college authorities to encourage students to apply for loans and grant them when in effect it is not a sound economic thing to do. This should be a *substantial factor* in determining whether a student loan should be dischargeable. (emphasis added).

*In re Littell,* 6 B.R. at 88.

■ The determination of whether Malloy's indebtedness owed to the United States of America for Health Education Assistance Loans (HEAL) loans are dischargeable in bankruptcy is controlled by 42 U.S.C. § 294f(g) rather than the "undue hardship" provision of § 523(a)(8) the Bankruptcy Code. *In re Green,* 82 B.R. 955, 957 (Bankr.N.D.Ill.1988); *In re Johnson,* 787 F.2d 1179 (7th Cir.1986); *In re Hines,* 63 B.R. 731, 735 (Bankr.D.S.D.1986) ("[S]ection 294f(g), and not Section 523(a)(8), is paramount for determining dischargeability in Chapter 7 matters."). 42 U.S.C. § 294f(g) provides that:

> a debt which is a loan insured under the authority of this subpart may be released by a discharge in bankruptcy under title 11 only if such discharge is granted—
> (1) after the expiration of the 5-year period beginning on the first date, as specified in subparagraphs (B) and (C) of section 294d(a)(2) of this title, when repayment of such loan is required;
> (2) upon a finding by the Bankruptcy Court that the nondischarge of such debt would be unconscionable; and
> (3) upon the condition that the Secretary shall not have waived the Secretary's rights to apply subsection (f) of

this section to the borrower and the discharged debt.[2]

11 U.S.C. § 294f(g). Thus, under § 294f(g), a debtor may not have a HEAL loan discharged unless the debtor shows that five years have passed since the date the repayment period began, that it would be unconscionable for the Bankruptcy Court to find the loans nondischargeable, and that the Secretary has not waived his rights contained in § 294f(f). *In re Green,* 82 B.R. at 957; *In re Johnson,* 787 F.2d at 1181. Prior to trial, the United States of America admitted that more than five years have passed since the first date that Malloy was to begin repayment on his HEAL loans and that the Secretary of the United States Department of Health and Human Services has not waived his rights provided for in § 294f(f). Therefore, the only issue before this Court is whether the nondischarge of Malloy's HEAL loans would be unconscionable.

The standard of "unconscionability" is stricter than the "undue hardship" standard of 11 U.S.C. § 523(a)(8). *In re Quinn,* 102 B.R. 865, 867 (Bankr.M.D.Fla. 1989); *In re Green,* 82 B.R. at 959; *In re Hines,* 63 B.R. at 736. Several Courts have looked to the plain meaning of the term "unconscionable" as it is defined in Webster's Dictionary—"lying outside the limits of what is reasonable or acceptable" or "shockingly unfair, harsh, or unjust." *In re Green,* 82 B.R. at 959 *citing* Webster's Third New International Dictionary 2486 (3d ed. 1981); *In re Hines,* 63 B.R. at 736; *In re Quinn,* 102 B.R. at 867. Additionally, "Words and Phrases defines unconscionable as 'conduct that is monstrously harsh and shocking to the conscience.'" *In re Hines,* 63 B.R. at 736. However, "what is unconscionable [in a bankruptcy context] defies precise definition and is better left to the discretion of the Bankruptcy Judge—unconscionability is likened to beauty in that it appeals to the senses and

---

**2.** Subsection (f) provides:

The Secretary may, after notice and opportunity for a hearing, cause to be reduced Federal reimbursements or payments for health services under any Federal law to borrowers who are practicing their professions and have defaulted on their loans insured under this subpart in amounts-up to the remaining balance of such loans. 42 U.S.C. § 294f(f).

is found in the eyes of the beholder." *Id.* However, in determining whether the facts of a case rise to the level of "unconscionability," courts have considered the following aspects of the debtor:

1. income;
2. earning ability;
3. health;
4. educational background;
5. dependents, if any;
6. age;
7. accumulated wealth; and
8. professional degree.

*In re Quinn,* 102 B.R. at 867.

■ Applying this law to those facts, we conclude the debts are dischargeable in bankruptcy, an undue hardship by a preponderance of the evidence and not to discharge the Federal debt would be unconscionable, shockingly unfair, harsh or unjust.

Simply put, from the record and from observing the demeanor of the debtor, he is not capable of having these debts cast upon him.

(1) He holds a menial job taking home but $693.55 per month.

(2) His living expenses are subminimal. By living with someone his rent is but $200 a month. There is nothing in his budget for clothing or health care insurance. He has no car.

(3) While not currently registered with the Virginia Employment Commission, he has diligently sought better employment, in vain. Counsel for the defendants kept suggesting jobs he might obtain or ought to obtain, but offered none [they didn't have to]. It is wistful for them, for the Court, to dream a picture of what he ought to be doing. The reality is another matter.

(4) While not physically, mentally or psychologically inhibited, he has a problem in society.

(5) Although accepted at Eastern Virginia Medical School, he performed abysmally. *More important,* he lacked the basic ability to perform. Dr. Robert McCombs, Associate Dean for Student Affairs and Admissions, testified in deposition that Malloy had difficulty taking tests and exams, an inability to apply basic science information to clinical problems, and that Malloy needed such special attention not necessary for other students. "He simply could not function in that [medical school] setting."

Further, Dr. McCombs said this "... many black students in particular come from families who are not as well educated and don't have the same kind of push as most white families, but I don't know whether that was a factor or not. I don't know what his background was."

Dr. Richard M. Oliver, Assistant for Student Affairs, testified by deposition that Malloy's stuttering may have affected his evaluations in the hospital.

(6) Counsel for the defendants believed during trial that Malloy was "hedging" on his answers, remote, not responsive. This trier of fact finds that was not so. The gap, it would appear, is a natural one reflecting difficulty in performing. The Court is of the opinion Malloy is fortunate to have the position he holds.

A case may not be decided on sympathy, and we have not. It may not be decided on the enormity of the debt, and we have not. But by virtue of his track record since medical school and prospects for him based upon ability, it would be an undue burden and it would be unconscionable not to discharge the debt. Malloy does not lack the desire to improve or make more of his life, but it is unconscionable to impose the servitude of nondischargeability upon him.

The debts are discharged in bankruptcy.

IT IS SO ORDERED.