**In re Harderison Edward MALLOY, Jr., Debtor.**

**Civ. No. 2:92cv779.**

United States District Court, E.D. Virginia, Norfolk Division.

July 9, 1993.

---

George M. Kelley, III, U.S. Atty's Office, Norfolk, VA, for U.S. Dept. of Health & Human Services.

Daniel G. Bloor, Office of Atty. Gen., Richmond, VA, for Com. of VA, State Educ. Assistance Agency.

George M. Kelley, III, U.S. Atty's Office, Norfolk, VA, for U.S. Dept. of Educ.

George M. Kelley, III, U.S. Atty's. Office, Norfolk, VA, for U.S.

Carlene Marie Isabella, Rutter & Montagna, John James McNally, Weisberg and Stein, P.C., Norfolk, VA, for debtor.

## MEMORANDUM OPINION AND ORDER

PAYNE, District Judge.

The United States ("government") appeals from a final order, 144 B.R. 38, entered by the United States Bankruptcy Court for the Eastern District of Virginia, Norfolk Division, (Hal J. Bonney, Jr., *Judge*) following an adversary proceeding, discharging Harderison E. Malloy's indebtedness for Health Education Assistance Loans ("HEAL") under 42 U.S.C. § 294f(g), *recodified at* 42 U.S.C. § 292f(g) (West Supp.1993), based on the Bankruptcy Court's conclusion that not to discharge the indebtedness would be "unconscionable" within the meaning of the statute.[1] For the reasons set forth below, the order of the Bankruptcy Court is reversed.

## BACKGROUND

On November 25, 1991, Malloy filed the underlying voluntary petition under Chapter 7 of the Bankruptcy Code. At the time of filing, Malloy had outstanding student loans for undergraduate and graduate school, comprising principal and accrued interest, in excess of $90,000. Specifically, Malloy owed $26,524.73 to the Virginia Education Loan Authority ("VELA") and $7,600 to the United States Department of Education for undergraduate loans, and owed $62,759.22 to the Department of Health and Human Services ("HHS") for HEAL loans used to finance Malloy's unsuccessful pursuit of a medical degree.

To finance his medical education, Malloy had borrowed $32,228 in HEAL loans, and had repaid $9,585 of this amount by the time he left medical school, without completing his degree, in December 1984. Through HHS, the government purchased Malloy's HEAL loans from Malloy's lender, Chase Manhattan Bank, N.A., on April 7, 1988, when the outstanding principal and accrued interest on the loans totaled $43,230.12. On six occasions from August 1985 through September 1987, Chase had granted Malloy's requests for forbearance. During these periods of forbearance, interest continued to accrue and was added to principal. The last forbearance request contained in the record indicates that Malloy was to begin repayment in June 1987. Malloy did not, however, commence voluntary payments at the end of the forbearance period. Because no voluntary payments were forthcoming from Malloy, the government deducted $74 and $300, respectively, from Malloy's 1990 and 1991 federal income tax refund and applied these sums to reduce Malloy's debt. In light of Malloy's persistent failure to service his debt, on November 6, 1991, the government commenced an action in the United States District Court for the Eastern District of Vir-

---

1. On October 13, 1992, Congress revised the legislation governing the federal loan insurance program for graduate students in health professions schools. *See* Pub.L. 102, Title I, § 102, Oct. 13, 1992, 106 Stat.1994. With a limited exception not here relevant, this legislation took effect on October 13, 1992, *see id.* at § 103, less than one month before this appeal was argued.

As part of this revision, Congress omitted § 294f, which, in its subsection (g), established conditions for discharge in bankruptcy of HEAL loans. Congress reenacted these identical conditions in § 292f(g). Because the pertinent conditions are identical, the opinion shall refer only to § 292f(g) for ease of reference.

ginia for judgment on the notes representing Malloy's HEAL indebtedness. By that time, Malloy had not made a voluntary payment on these loans in over eight years, and, because of accrued interest, Malloy's debt stood at over $62,000. The government's collection action appears to have precipitated Malloy's Chapter 7 petition, which he filed less than three weeks later. Malloy's bankruptcy filing stayed the district court proceedings. *See* 11 U.S.C. § 362.

Thereafter, on March 4, 1992, Malloy commenced an adversary proceeding against the Commonwealth of Virginia, the United States Department of Education, and HHS seeking discharge of his educational indebtedness. According to Malloy's amended complaint, discharge of the loans made or guaranteed by VELA and the United States Department of Education was necessary because nondischarge would constitute an "undue hardship" on him. *See* 11 U.S.C. § 523(a)(8) (stating that a discharge in bankruptcy does not apply to an educational loan made or guaranteed by a governmental unit unless "excepting such debt from discharge ... will impose an undue hardship on the debtor."). Malloy contended that discharge of the HEAL loans was appropriate because nondischarge would be "unconscionable." *See* 42 U.S.C. § 292f(g) (providing that discharge in bankruptcy of loans insured under that subpart is permissible if, among other things, the Bankruptcy Court finds "that the nondischarge of such debt would be unconscionable.")

In its answer, the United States Department of Education agreed that the $7,600 owed to it was dischargeable, and an order to that effect was entered by the Bankruptcy Court on June 11, 1992. Because the Commonwealth and HHS continued to object to discharge of the debt Malloy owed to them, an evidentiary hearing was held on August 4, 1992, to determine whether the VELA and HEAL loans also should be discharged, *i.e.*, whether nondischarge would be an "undue hardship" with respect to the VELA loans or would be "unconscionable" with respect to the HEAL loans.

The facts established at the hearing regarding Malloy's age, health, educational and employment history, and financial condition are all relevant factors in determining "unconscionability" *see, e.g., In re Quinn*, 102 B.R. 865, 867 (Bankr.M.D.Fla. 1989), and are largely undisputed. At the time of the hearing, Malloy was a healthy 39 year-old with no dependents. As for his educational background and training, Malloy entered Luther Rice College in 1972, but soon withdrew and matriculated to George Mason University. Malloy later withdrew from George Mason as well, apparently for academic reasons. In 1974, however, Malloy was graduated from Virginia Community College with a two-year Associates Degree in general sciences. The following year, Malloy entered Virginia Commonwealth University, and, in 1979, received a Bachelor of Sciences Degree in Biology, earning a grade average of 2.4 in sciences and a 2.79 overall.

Intent on becoming a physician, Malloy attended a summer program for prospective medical students at Eastern Virginia Medical School ("EVMS") in 1979 and also worked as a microbiologist for the Commonwealth. In the fall of 1980, he entered EVMS as a full-time medical student and began the 15–month basic science program. Unfortunately, Malloy encountered academic difficulties, apparently failing four out of five science courses. As a result, Malloy was placed on a reduced course load and was given an additional fifteen months to repeat and complete the basic science curriculum. After successfully completing this course work, Malloy began the clinical phase of his training, which comprised four clinical rotations. Malloy failed three of the rotations and withdrew voluntarily from EVMS in July 1983. By that time, Malloy had amassed $32,228 in HEAL loans.[2]

2. Specifically, Malloy signed four promissory notes for loans to finance his medical education on the following dates in the following amounts: July 1981—$1,286; November 1981—$5,297; July 1982—$14,795; and March 1983—$10,850.

Undeterred, Malloy participated in a program at the Medical College of Virginia designed for medical students with academic difficulties from September 1983 until May 1984. After completing this remedial program, Malloy returned to EVMS to complete the remainder of his clinical rotations. However, when Malloy again failed the internal medicine rotation, he was required to leave EVMS in December 1984.

Malloy stipulated that he suffers from no mental or physical disability. This self-assessment was reinforced by the deposition testimony of two doctors on the EVMS staff, who observed no mental, physical or psychological problems with Malloy. Moreover, the remedial program at MCV did not diagnose that Malloy had learning disabilities. The EVMS doctors agreed, however, that Malloy was not suited for medical school. Among other things, one doctor testified that he was concerned with Malloy's test taking skills and ability (or lack thereof) to work successfully through clinical problems. Malloy also apparently stutters, though that alone would not have prevented him from becoming a physician.

Unable to gain admission to another medical school, Malloy began employment at Sears, Roebuck, and Co. in 1985 as a part-time telephone sales representative, earning $3,753.83 in 1985, $6,316 in 1986, and $3,453.44 in 1987. Sometime in 1987, Malloy apparently left Sears, worked briefly for the Norfolk City Schools teaching autistic children, and began work, initially on a substitute basis, at a nursing home. From these endeavors, as well from work at another convalescent facility, Malloy earned $7,492.55 in 1988. From 1988 to the present, Malloy has been employed by the Sen-

tara Nursing Home system, currently in the capacity of Assistant Activities Director at Sentara's facility in Chesapeake, Virginia, earning $8,154.55 in 1989, $11,420.41 in 1990, $11,462.19 in 1991, and $11,533.80 in 1992.[3]

Although Malloy obviously is not in a high income position, his income has increased steadily since 1987. At the time of his bankruptcy, Malloy claimed a monthly gross income of $961.15, a net income of $693.55, and monthly expenses of $683.36. Included within these expenses are $200 per month for rent and $43.36 for car insurance. Malloy's mother apparently helps him with clothing expenses; his health and dental insurance are provided through work.

Based on these facts, the Bankruptcy Court ordered Malloy's educational debts discharged, concluding that nondischarge of the VELA debt would be an "undue hardship" under 11 U.S.C. § 523(a)(8), and that nondischarge of the HEAL debt would be "unconscionable" under 42 U.S.C. § 292f(g).[4] To support its ultimate conclusion that nondischarge of the HEAL loans would be unconscionable, the Bankruptcy Court found "from the record and from observing the demeanor of the debtor," among other things: that Malloy held a "menial job"; that his living expenses were "subminimal"; that he had no car; that he budgeted nothing "for clothing or health care"; that, although he had no physical, mental, or psychological problems, "he [nonetheless] has a problem in society"; and that "he lacked the basic ability to perform" in medical school. These same findings supported the Bankruptcy Court's determination of undue hardship. The gov-

---

3. Although Malloy has attempted to obtain more remunerative employment since he left medical school, the record reflects that the bulk of his job search efforts, which were focused mainly on technical and scientific jobs, occurred principally between December 1984 and August 1987. The majority of positions Malloy sought apparently were filled by other applicants. Malloy's job search since 1988 has been sporadic, consisting mostly of searching the want ads. He is not currently registered with the Virginia Employment Commission.

4. A debtor seeking discharge of educational debt under 42 U.S.C. § 292f(g) must demonstrate, in addition to unconscionability, that five years have passed since repayment of the loan was required and that the government has not waived its statutory rights under § 292f. *See, e.g., In re Johnson,* 787 F.2d 1179, 1182 (7th Cir.1986) (per curiam). Because the government admitted before trial that the latter two requirements had been satisfied, the only issue before the Bankruptcy Court, and on appeal, is whether nondischarge of the HEAL loan debt would be unconscionable.

ernment has appealed from the order discharging Malloy's HEAL loan indebtedness. The Commonwealth has not appealed the determination respecting the VELA loans.

## DISCUSSION

■ It is well established that a reviewing court must accept the findings of fact of the Bankruptcy Court unless those findings are "clearly erroneous." *See, e.g., In re Johnson*, 960 F.2d 396, 399 (4th Cir. 1992); Bankruptcy Rule 8013. The reviewing court, however, is not required to accept the Bankruptcy Court's "conclusions as to the legal effect of those [factual] findings" and reviews these determinations *de novo*. *Brunner v. New York State Higher Educ. Services Corp.*, 831 F.2d 395, 396 (2d Cir.1987) (reviewing bankruptcy court determination under 11 U.S.C. § 523(a)(8)(B) that nondischarge would be an "undue hardship"); *see also In re Johnson*, 960 F.2d at 399 (legal questions resolved by Bankruptcy Court reviewed *de novo* ).

■ Here, the Bankruptcy Court's conclusion that nondischarge of Malloy's HEAL indebtedness would be "unconscionable" under 42 U.S.C. § 292f(g) "requires a conclusion regarding the legal effect of the bankruptcy court's findings as to ... [the debtor's] circumstances." *Brunner*, 831 F.2d at 396. Such mixed questions of law and fact are reviewed *de novo*. *See, e.g., Black & Decker Corp. v. Commissioner of Internal Revenue*, 986 F.2d 60, 63 (4th Cir.1993); *Besta v. Beneficial Loan Co. of Iowa*, 855 F.2d 532, 533 (8th Cir. 1988) (observing that determination of whether loan agreement was "unconscionable" within meaning of statute was mixed question of law and fact reviewable *de novo* ); *see also Brunner*, 831 F.2d at 396.

■ Considering these standards of review, the court turns to the merits of this appeal. In enacting § 292f(g), Congress provided no definition of the term "unconscionable." Consequently, courts seeking to define the unconscionability standard generally have relied on the dictionary definition of the term, namely, something that is "lying outside the limits of what is reasonable or acceptable," or "shockingly unfair, harsh, or unjust." *In re Quinn*, 102 B.R. at 867; *see also In re Emnett*, 127 B.R. 599, 602 (Bankr.E.D.Ky.1991); *In re Green*, 82 B.R. 955, 959 (Bankr.N.D.Ill. 1988).

■ Using this definition, courts have examined the totality of the facts and circumstances surrounding the debtor and his or her obligation to determine whether nondischarge of the obligation would be "unconscionable." *See, e.g., In re Emnett*, 127 B.R. at 602. In making this inquiry, courts have considered factors such as the debtor's income, earning ability, health, educational background, dependents, age, accumulated wealth, and professional degree. *See, e.g., In re Emnett*, 127 B.R. at 603; *In re Quinn*, 102 B.R. at 867. Furthermore, as several courts have noted, the standard of unconscionability governing discharge of HEAL loans is stricter than the "undue hardship" standard applicable to the discharge of other types of educational loans under 11 U.S.C. § 523(a)(8). *See, e.g., United States v. Wood*, 925 F.2d 1580, 1583 (7th Cir.1991) (per curiam); *In re Emnett*, 127 B.R. at 603; *In re Quinn*, 102 B.R. at 867; *In re Hines*, 63 B.R. 731, 736 (Bankr. N.D.Ga.1986).[5] The debtor has the burden of proving unconscionability. *See, e.g., In re Johnson*, 787 F.2d 1179, 1182 (7th Cir. 1986) (per curiam); *In re Quinn*, 102 B.R. at 868.

The difficulty of satisfying the unconscionability standard is illustrated by the decision in *In re Hines*. There, the debtor applied for and received a $5,000 loan to finance his medical education. In his third year of medical school, however, the debtor

---

5. The "undue hardship" standard itself is not easily met, having been defined to mean a " 'certainty of hopelessness' that future payments cannot be made," based on the "presence of 'unique' or 'extraordinary' circumstances which would render it unlikely that the debtor ever would be able to honor his [or her] obligations." *In re Ballard*, 60 B.R. 673, 674–75 (Bankr. W.D.Va.1986); *see also In re Love*, 33 B.R. 753, 754–55 (Bankr.E.D.Va.1983). Moreover, "undue hardship is not based on a present inability to pay." *In re Ballard*, 60 B.R. at 67.

was dismissed for academic reasons and never received his degree. At the time he filed his Chapter 7 petition, the amount of principal and interest on his loan had reached $11,274.51. The debtor was then married with two children, ages two and four, and was in good health. *See* 63 B.R. at 733.

Between the time of his dismissal from school and his bankruptcy filing, the debtor held a variety of odd jobs, including chimney sweep and bartender, and had an average annual income of only $2,000. After he filed for bankruptcy, the debtor opened a tire business. Still, however, the debtor earned a monthly income of only $262 against $500 in monthly expenses. *Id.* The debtor's spouse earned approximately $7,000 per year. In addition, the debtor's bankruptcy schedules indicated that at the time of filing, he owed debts for school loans and unpaid tuition in the amount of $68,900. *Id.* at n. 4.

Evaluating these facts, the court concluded that the debtor had not met the "undue hardship" standard that the debtor claimed applied, much less the heightened unconscionability standard. *Id.* at 736–37. Among other things, the court noted that the debtor was healthy, college educated, and able to work, even though the debtor had been underemployed. *Id.* at 737. The fact that the debtor was not enjoying the benefits of his loan assisted education was not significant. *See id.; see also In re Green,* 82 B.R. at 956, 959–60. *But see In re Gronski,* 65 B.R. 932, 936–37 (Bankr. E.D.Pa.1986) (dictum).

Considering the strictness of the unconscionability standard, as applied by the court in *Hines,* among others, the government contends that the Bankruptcy Court erred in concluding that nondischarge of Malloy's HEAL loan debt would be unconscionable. The government also argues that certain factual findings on which the Bankruptcy Court's determination of unconscionability appears to rest are clearly erroneous.

■ The court first addresses the government's challenges to the factual underpinnings of the Bankruptcy Court's conclu-

sion. Under the familiar standard, a factual finding is "clearly erroneous" when "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). The government principally challenges the Bankruptcy Court's broad conclusions that Malloy has "a problem in society" and a general "difficulty in performing." Viewing the record in its entirety, the court agrees with the government that the record does not support such broad findings, even considering the Bankruptcy Judge's opportunity to observe Malloy's demeanor. *See* Bankruptcy Rule 8013.

■ It is undisputed that Malloy obtained a college degree and earned grades sufficient to gain admission to EVMS. Moreover, the two EVMS staff physicians who testified in the adversary proceeding (via deposition) noted that Malloy suffered from no physical, mental, or psychological problems. Malloy stipulated as much. Indeed, at oral argument in this matter, Malloy's counsel conceded that he had no general learning disability, though he did need remedial help in medical school. Simply stated, however, the record provides no basis to find from Malloy's failure to meet the rigorous academic standards of medical school that he has a pervasive "problem in society."

Likewise, there is no record support for the conclusion that Malloy has "difficulty in performing." At most, the record indicates that Malloy had problems taking medical school tests and applying his science knowledge to problems presented in his clinical rotations. It was error, however, to draw from these facts the general conclusion that Malloy generally cannot perform. Not only did Malloy earn a college degree, but, since withdrawing from medical school, Malloy has been continually employed. And, although he does not currently earn princely sums, his income has

increased steadily since 1988.[6]

Putting these erroneous findings aside, the record shows that, at the time of filing, Malloy was a healthy, college educated, 39 year-old earning $11,533.80 as an assistant activities director at a nursing home. Malloy listed minimal living expenses on his bankruptcy schedules, lives with a roommate to save on rent, and has no dependents. His mother assists him in purchasing clothes and his medical and dental insurance are provided by his employer. Moreover, as Malloy testified and as the record reveals, most of Malloy's efforts to secure more remunerative employment occurred before or during August 1987. Indeed, Malloy is not currently registered with the Virginia Employment Commission. Malloy is arguably now underemployed, and given his college degree, it is not unreasonable to assume that, with effort, his income could increase in the coming years. Under these circumstances, while Malloy's situation is unfortunate, it is not unconscionable, *i.e.*, "shockingly unfair or unjust" or "outside the limits of reasonableness or acceptability," to deny his request for discharge of his entire HEAL debt. *See In re Hines*, 63 B.R. at 736–37.

Malloy nevertheless suggests that it is unconscionable for the government to collect the entire amount of the HEAL debt because the government did not institute enforcement proceedings before November 1991. This argument is unpersuasive.

Under the terms of Malloy's promissory notes, repayment of his HEAL loans was to begin in October 1985, *i.e.*, 10 months after he ceased being enrolled as a full-time student in medical school. However, apparently believing himself unable to service his debt, Malloy made a series of six requests for forbearance, beginning in August 1985, which were granted by his lender. During these periods of forbearance, interest accrued and was added to outstanding principle. As a result, when Mal-

loy's requested forbearance ended in June 1987, his outstanding debt, including principal and interest, totaled (as of May 31, 1987) $40,415.84. The following April, the government fulfilled its obligation under the HEAL program to purchase Malloy's HEAL debt from Chase, by which time the debt had grown to $43,230.12. In May 1990 and May 1991, the government deducted funds from Malloy's federal income tax refunds. In November 1991, the government commenced the action for judgment on Malloy's notes. The record contains no evidence explaining why neither Chase nor the government instituted collection proceedings sooner.

Given this chronology, and considering that the burden to prove unconscionability rests with Malloy, the court cannot conclude that the failure to commence civil proceedings sooner against Malloy to collect on his promissory notes makes it unconscionable to hold Malloy responsible for his HEAL debt. Malloy's own forbearance requests extended the date on which repayment was to begin until June 1987. Although the government obtained Malloy's loans in April 1988 and did not garnish Malloy's income tax returns until May 1990, Malloy was well aware during this time that he had an ongoing obligation to repay this debt. Nevertheless, the record reveals no attempts by Malloy to contact HHS to discuss a mutually agreeable arrangement to service his debt. Moreover, Malloy has produced no evidence indicating that the government's "delay" in garnishing his tax refunds or in commencing a civil action was either unreasonable or unacceptable. Finally, beginning in October 1990, *i.e.*, five years after repayment of his HEAL loans first became due, *see* 42 U.S.C. § 292f(g)(1), Malloy could have sought discharge of his HEAL loans in bankruptcy at any time without waiting for the government to institute collection pro-

---

**6.** The Bankruptcy Court also found that Malloy did not own a car. At oral argument on this appeal, however, Malloy's counsel informed the court that Malloy did own a car. This admission is confirmed by the fact that, on the schedules Malloy submitted in connection with his Chapter 7 filing, Malloy lists as an expense a payment for car insurance. Although this finding is clearly erroneous, it is harmless, *see* Fed. R.Civ.P. 61, as this court does not rely on that fact in determining whether nondischarge of Malloy's HEAL loans would be unconscionable.

ceedings.  *Cf. Austad v. United States,* 386 F.2d 147, 151 n. 1 (9th Cir.1967).

In short, much of the accrued interest on Malloy's debt is attributable to his own conduct in requesting forbearance and in failing to seek discharge in bankruptcy at an earlier date.  While the government could well have commenced its collection action sooner, Malloy has not sustained his burden of proving that the government's failure to do so renders it "shockingly unfair or unjust" to hold him accountable for the entire amount of his HEAL debt.

### CONCLUSION

Based on the foregoing, the final order of the Bankruptcy Court is reversed.

It is so ORDERED.