UNITED STATES of America, Appellant,

v.

Phyllis Ann KEPHART, M.D.,
Appellee–Cross–Appellant.

No. 94–CV–6192L.

United States District Court,
W.D. New York.

Aug. 11, 1994.

Brian M. McCarthy, Asst. U.S. Atty., Rochester, NY, for appellant.

Christopher K. Werner, Suter, Doyle, Kesselring, Lawrence & Werner, Rochester, NY, for appellee–cross-appellant.

## AMENDED DECISION AND ORDER

LARIMER, District Judge.

Pending before the Court are cross-appeals from a Decision and Order of the Bankruptcy Court for the Western District of New York (John C. Ninfo, II, J.). Phyllis Ann Kephart ("Kephart") is a physician, now 53 years old, who graduated from Boston University School of Medicine in 1982. To pay for her tuition and expenses at medical school, Kephart applied for and received four scholarship awards through the National Health Service Corporation Scholarship Program ("NHSC" or "Service"). These awards paid all of Kephart's tuition and expenses as well as a monthly stipend. These scholarship awards and stipends totalled approximately $68,000.

In consideration for this free education, Kephart signed an NHSC Contract ("the Contract") which required her to practice medicine upon graduation for four years at a location selected by the Secretary of Health and Human Services ("Secretary"). The Contract included a liquidated damage provision that required Kephart, upon default, to repay the Secretary an amount equal to three times the total scholarship monies awarded, plus interest. Kephart did default on her obligation and has failed to complete her service requirement. At this point, her debt to the Government, including interest, is over $625,000.

On March 26, 1990, the Government commenced an action in the Western District of New York to recover damages provided by statute, but on or about April 16, 1992, Kephart filed a petition in bankruptcy under Chapter 7. The issue before the Bankruptcy Court, and this Court, is whether the $625,000 debt, or part of it, should be discharged in bankruptcy.

Judge Ninfo wrote a lengthy decision, entered January 11, 1994, and determined that the debt was partially dischargeable on condition that Kephart maintain her employment at the Veteran's Administration Hospital in Bath, New York and conditioned on her paying $2,000 per month for 60 months to partially reimburse the Service. As long as those conditions were met, the balance of the debt to the Government would be discharged.

The Government appealed that decision on several grounds, but principally on the ground that Judge Ninfo erred as a matter of law in interpreting the statute, 42 U.S.C. § 254o(d)(3)(A) which provides in effect that debts to the Secretary arising out NHSC's scholarship program are not dischargeable in bankruptcy for five years after default and only then if the Bankruptcy Court "finds that non-discharge of the obligation would be unconscionable." The Government contends that the Bankruptcy Court erred as a matter of law in determining that non-discharge would be unconscionable. Kephart cross-appeals on the grounds that the entire debt should have been discharged.

For the reasons that follow, the Decision and Order of the Bankruptcy Court is reversed and remanded with a direction to enter an order that Kephart's debt to the

Government is not dischargeable under 42 U.S.C. § 254o(d)(3)(A).[1]

## FACTS

The essential facts leading up to this dispute are not in dispute, and they are set out in some detail in Judge Ninfo's decision.

Kephart graduated from Boston University School of Medicine in 1982. Virtually all of her tuition, expenses and a monthly stipend were paid by the Service for all four years of her training in medical school. There is no dispute that Kephart signed the Contract agreeing to provide medical services upon graduation at a site selected by the Secretary. There is no dispute that at the time she signed this contract she understood its terms and obligations.

When Kephart graduated in 1982, she did not fulfill her obligation. Rather, she requested a two-year deferment to complete a year of training in family medicine and a year's residency in internal medicine. These requests were granted by NHSC. In 1984, Kephart requested an additional one-year deferment for further training in infectious diseases. Kephart believed and represented that this additional training was necessary to become board certified in internal medicine. NHSC granted the deferment, but on condition that it receive documentation that the additional year was necessary for board certification. Kephart was unable to obtain that documentation, and later that fall, the Service denied Kephart's request for the additional one year deferment. Nevertheless, in September 1984, Kephart went to Boston, Massachusetts to pursue the residency program in infectious diseases.

During the Fall of 1984, the Service attempted to work with Kephart to get her placed at an appropriate site. In July 1984, the Service sent Kephart an extensive placement packet by certified mail. Kephart testified before the Bankruptcy Court that she never received that package, but it does appear that someone at her place of residence did sign for the documents. In any event, in

November 1984, Kephart participated via telephone with representatives of the Service concerning the selection of a site to complete her service obligation. In late November 1984, the Service sent Kephart a letter confirming that it had sent her a questionnaire concerning available sites and eventually the Service notified her that she had been assigned to serve in the State of Louisiana. Kephart received detailed instructions concerning her options and opportunities to visit available sites in Louisiana. Kephart was also advised that if she failed to select an appropriate site in Louisiana by April 15, 1985, she would be assigned by the Service to a high priority site based on NHSC needs. Kephart was advised to notify the Service by December 3, 1984 of her intentions.

The proof is clear that Kephart did not respond to any of those letters and failed to notify the Service by December 3, 1984 of her intentions. Kephart testified at the hearing before the Bankruptcy Court that she did not want to practice in Louisiana, that she had suffered personal problems in the Fall of 1984, and that she became "psychologically paralyzed" (Decision of Bankruptcy Court, p. 8) and was unable to deal with the matter.

Thereafter, Kephart was advised that she was in default and that the treble damage provision of the Contract would be invoked by the Service.

Kephart did nothing further until early 1986 when she contacted an attorney in an attempt to work out an accommodation with NHSC. Apparently in May of 1986, the Service agreed to forgive the debt if Kephart agreed at that time to complete her service at a site to be determined by NHSC. Rather than accept that agreement, Kephart again petitioned for an additional deferment, until July 1987, to complete a second year of a two-year fellowship in infectious diseases. NHSC denied the request because her work in infectious diseases was not a needed specialty for NHSC. Kephart rejected the for-

---

1. The standard of review in this case is *de novo* since it involves a question of law, that is, construction of the term "unconscionable" as contained in the applicable statute, 42 U.S.C. § 254o(d)(3)(A). However, the result would be the same under the clearly erroneous standard. *See Matthews v. Pineo*, 19 F.3d 121, 123 n. 2 (3d Cir.1994).

bearance agreement and instead decided to finish her fellowship.

Upon completion of this training, in 1987, Kephart obtained a position at the Veteran's Administration Hospital in Bath, New York where she continues to be employed today.

### DISCUSSION

From even a cursory review of the relevant statutes, and their legislative history, it is clear that Congress has severely restricted the ability of physicians like Kephart to file for bankruptcy in order to discharge a debt incurred by defaulting on the terms of a NHSC Scholarship contract. There are very few circumstances where Congress has repeatedly taken steps to circumvent the ability of debtors such as Kephart to discharge this type of debt. To understand the reasons for this Congressional action, it is necessary to understand the purpose behind the National Health Service Corps Scholarship Program.

The program was enacted by Congress in 1976 to help alleviate the poor distribution of health care professionals throughout the United States. H.R.Rep. No. 266, 94th Cong., 2d Sess., pt. 1, 22 (1976) *reprinted in* 1976 U.S.C.C.A.N. 4947, 4964. Remote rural areas and the poorest sections of the inner cities were the most drastically affected by the lack of physicians. The Congressional remedy was quite direct. The Scholarship Program would provide medical students and other related professionals with scholarships to pay for tuition and living expenses at medical school. In return for these grants, recipients agree to serve after medical school in a "health professional shortage area" determined by the Secretary. 42 U.S.C. § 254*l* (f)(1)(B)(IV). Essentially, the student signs a contract agreeing to serve in a shortage area for a term equal to the number of years for which she receives scholarship grants. In Kephart's case, since she received a four year scholarship, she was required to serve four years for the Service.

Prior to the establishment of the National Health Service Corps, Congress attempted to alter the unequal distribution of health professionals through loan forgiveness programs. One such program cancelled a por-

tion of an individual's Federal Health Professions Student Loan, in exchange for service in an underserved area. S.Rep. No. 887, 94th Cong., 2d Sess. 47 (1976). In another program, the Government reimbursed up to 85 percent of an individual's student loans, from any source, in exchange for service. *Id.* However, the programs were not effective. They did not alter the poor distribution of health professionals in inner city and rural areas. "Weak financial incentives combined with liberal buy-out provisions did not induce physicians and other health care professionals to locate their practices in rural communities and urban inner cities." *Id.*

In an attempt to remedy this continuing lack of physicians in needed areas, Congress created the National Health Service Corps in 1976. *See Rendleman v. Shalala,* 21 F.3d 957, 963 (9th Cir.1994) (summarizing the Congressional changes to the National Health Services Act).

From this history, it is clear that the Scholarship Program was not meant to provide tuition assistance for medical students. The program was not meant to be a financial-aid mechanism for medical students but a vehicle for providing needed medical care and services to those areas of the country that lacked it. "The Committee wishes *to emphasize in the strongest possible terms* that it does not view the National Health Service Corps scholarship program as a mechanism solely intended to subsidize health professional education. Rather, in return for substantial subsidization of the costs of education, the Committee views the National Health Service Corps scholarship program as a means to overcome a geographic maldistribution of health professionals." S.Rep. No. 887, 201 (emphasis added).

Congress included a provision in the statute that imposed severe monetary penalties on a student who defaulted and failed to meet the service requirements of the contract. The statute provided that the defaulting student was liable for liquidated damages to the Government equal to three times the amount of the scholarship grants plus interest. 42 U.S.C. § 254*o*(b)(1)(A).

The purpose for this liquidated damage provision is not only to compensate the Government for its losses, but also to impress upon the applicant the serious nature of the obligation and to deter students such as Kephart from accepting the benefits of the Scholarship Program and then reneging on the service commitment. *Buongiorno v. Sullivan,* 912 F.2d 504, 509–10 (D.C.Cir.1990); *United States v. Bills,* 822 F.2d 373, 376 (3d Cir.1987).

When the present scholarship program was created in 1976, Congress underscored the importance of the obligation to perform service by providing that the liquidated debt incurred through defalcation could not be discharged in bankruptcy for five years. 42 U.S.C. § 254*o*(d)(3)(A). Congress again evidenced its intent to restrict the ability to discharge this debt when it amended the Act in 1987, and provided that this debt could not be discharged even after five years unless the bankruptcy court determined that it would be unconscionable to deny discharge. The Act now provides that after the five-year period, the NHSC scholarship obligation is dischargeable in bankruptcy but only if the bankruptcy court determines that non-discharge would be "unconscionable."

The statute, 42 U.S.C. § 254*o*(d)(3)(A), concerning debts discharged in bankruptcy reads as follows:

> Any obligation of an individual under the Scholarship Program (or a contract thereunder) or the Loan Repayment Program (or contract thereunder) for payment of damages may be released by a discharge in bankruptcy under title 11 of the United States Code only if such discharge is granted after the expiration of the five-year period beginning on the first date that payment of such damages is required, and only if the bankruptcy court finds that nondischarge of the obligation would be unconscionable.

This appeal, of course, revolves around the concept of unconscionability: Would it be unconscionable to deny Kephart's application to discharge the debt under the circumstances of this case?

■ In my view, in light of the clear Congressional intent that such debts shall not be freely dischargeable in bankruptcy and the clear Congressional intent to deter scofflaws such as Kephart who violate their service obligations, I believe that the Bankruptcy Court erred in allowing a partial discharge of the debt conditioned upon Kephart's remaining at the VA Hospital and making the $2,000 monthly payments.

■ First of all, Congress chose the word "unconscionable" to be the benchmark for determining whether or not discharge was appropriate. Although Congress did not define the term in the statute, it is clear by its choice of words that it intended to bar discharge except in the most exceptional cases.

■ The Bankruptcy Code itself precludes the discharge of student loans which are guaranteed or insured by the Government unless the debtor establishes that it would cause "undue hardship" to deny the discharge. 11 U.S.C. § 523(a)(8)(B). The concept of "undue hardship" is stringent enough but clearly the requirement of unconscionability requires an even greater showing before discharge is appropriate. *See In re Dillingham,* 104 B.R. 505, 512 (Bankr. N.D.Ga.1989); *In re Hines,* 63 B.R. 731, 736 (Bankr.D.S.D.1986).

Although Congress did not define the term "unconscionable," courts dealing with this issue have found the term to mean "shockingly unfair, harsh or unjust" or "outrageous." *Matthews v. Pineo,* 19 F.3d 121, 124 (3d Cir.1994).

■ The burden is on the debtor to convince the Court that refusal to discharge the debt would be unconscionable. *Id.* It is a heavy burden because the unconscionability standard is strict and narrowly applied. In reversing the Bankruptcy Court's decision allowing discharge, the Third Circuit in *Matthews* noted that the Bankruptcy Court there failed to recognize "the extremely limited scope of the concept of unconscionability." *Id.*

*Matthews* certainly demonstrates a very strict, narrow approach toward determining whether denial of discharge would be unconscionable. Other courts have clearly demon-

strated that the unconscionability standard is not easily met.

Loans granted under the Health Education Assistance Loan ("HEAL") Program, like the NHSC Scholarship Program may not be discharged in bankruptcy unless the Court determines that it would be unconscionable to deny such discharge. 42 U.S.C. § 294f(g). The standard of unconscionability is the same. A review of bankruptcy court decisions concerning discharge of HEAL debts shows that discharge is appropriate in only the most exceptional circumstances. *See Kline v. United States,* 155 B.R. 762, 766 (Bankr.W.D.Mo.1993) (repayment of HEAL unconscionable because she was not a practicing chiropractor and had a series of personal and mental health problems that prevented her from maintaining a job); *Malloy v. United States,* 144 B.R. 38, 43 (Bankr. E.D.Va.1992) (repayment of HEAL unconscionable where debtor did not complete medical school and had a low-paying job); *United States v. Quinn,* 102 B.R. 865, 867 (Bankr.M.D.Fla.1989) (repayment of HEAL not unconscionable where debtor licensed to practice dentistry and capable of repaying her loan).

■ There are several circumstances here which suggest that discharge is inappropriate in Kephart's case. First of all, Kephart and her husband together have income of approximately $160,000 per year. It is true that some of that income is the result of Kephart's taking an additional job in the emergency room of a nearby hospital. It is true that her indebtedness to the Service is so large that it is unlikely that Kephart will be able to discharge her debt entirely at Kephart's present rate of income. Nevertheless, an annual gross income of $160,000 is substantial. But, more to the point, Kephart has chosen to work at the VA Hospital at a salary considerably less than she might make in private practice. Just because the debt is large and Kephart has chosen a position with low compensation does not compel the conclusion that it would be unconscionable to deny discharge. Of course, the substantial

size of the debt is due to Kephart's conduct. Because twelve years have passed since she graduated from medical school, the interest alone is indeed substantial. But it would be perverse to allow the debtor to benefit from her own inaction, delay and recalcitrance by automatically granting discharge simply because the debt is a sizeable one. This, of course, would benefit those who delay and obstruct the longest and could encourage other students to follow the course taken by Kephart.

Furthermore, Kephart still holds the key to extricate herself from her self-created financial morass. Even today, if Kephart agreed to complete the service requirement as directed by the Secretary, the debt, including interest would be forgiven.[2]

■ The Third Circuit found this factor to be significant in the recently decided *Matthews* case, a case remarkably similar to the case at hand. I concur with the Third Circuit's determination that simply because the option to now complete the service obligation is "disruptive, unpleasant, undesirable or painful" *Matthews,* 19 F.3d at 124, does not make the situation "unconscionable." Obviously, Kephart is established in Bath at the VA Hospital and she is married, but on this record I am not convinced that the option to complete service is out of the question. Kephart does not have minor children living with her who would be adversely affected by the move. Kephart was not adverse to moving when it suited her needs, for example, when she went to Boston to complete a fellowship in infectious diseases or when she went to the Irvine Medical Center, University of California, Orange County, California to complete her residency.

From the record, it appears that even in her present position, Kephart has substantial disposable income. The Bankruptcy Court determined that she had household disposable income of about $2,000 a month. This is certainly not insubstantial. In addition, there was testimony before the Bankruptcy Court that Kephart could be earning sub-

**2.** It is NHSC policy to extend this option to scholarship recipients even after they enter bankruptcy court. Brief of appellant, United States of America, at 14; *see also Matthews,* 19 F.3d at 124 n. 3.

stantially more money in private practice. Therefore, it does not necessarily follow that Kephart's present salary is unalterable. Again, just because Kephart has chosen to work in a job paying relatively modest compensation does not mean that the Government, who paid for her medical education, should suffer the consequences. This may seem "harsh" on Kephart, but it would be equally unreasonable and harsh on the Service to allow discharge.

The Bankruptcy Court selected a five-year payout plan to complete the partial discharge. This time seems much too short and favorable to Kephart in light of the obligations imposed upon her by Contract and by statute. Based on her income, and other circumstances, there appears to be no reason to justify the five-year plan.

No doubt Kephart is performing needed medical services at the VA Hospital. That fact was of importance to the Bankruptcy Court. I certainly share the Bankruptcy Court's opinion that Kephart's services at the VA hospital are commendable and beneficial to the patients there. However, no matter how beneficial that service might seem to be to the Bankruptcy Court or to this Court, it is not the Court's province to select the site where necessary medical services are to be performed. It is not for this Court any more than it is for Kephart to unilaterally determine the best place for her to practice medicine. Kephart was and is willing to provide needed medical services but on her own terms, according to her pace and at a site that she prefers. Unfortunately, that is not the nature of the bargain that she struck with the Service when she accepted its money to pay her tuition at medical school. It is not the physician but the Service and the Secretary who determine where scarce medical resources are to be applied. For this Court or the Bankruptcy Court to make a judgment that Kephart's chosen practice is beneficial or "good" defeats the purpose of the statute and preempts the power of the Secretary to make that important determination.

## CONCLUSION

The Decision and Order of the Bankruptcy Court for the Western District of New York, filed January 11, 1994, is reversed and remanded with a direction to enter an order that Phyllis Kephart's debt to the Government, as listed on the petition in bankruptcy, is not dischargeable under 42 U.S.C. § 254o(d)(3)(A).

IT IS SO ORDERED.