In re Mayra Fe SOLER, Debtor.

**Mayra Fe Soler, Plaintiff,**

v.

**United States of America, on behalf of its agency the United States Department of Health & Human Services as Assignee of The Student Loan Marketing Association, "Sallie Mae," aka the Student Loan Marketing Association, Wisconsin Higher Education Aids Board, and United Student Aid Funds, Inc., Defendants.**

**Bankruptcy No. 00–40599.
Adversary No. 00–4201.**

United States Bankruptcy Court,
D. Minnesota.

April 26, 2001.

See also 250 B.R. 694.

*MEMORANDUM OPINION AND ORDER DETERMINING DIS-CHARGEABILITY OF DEBTS*

ROBERT J. KRESSEL, Bankruptcy Judge.

This proceeding came on for trial on the plaintiff's complaint seeking to determine the dischargeability of certain student loan debts under 11 U.S.C. § 523(a)(8) and 42

U.S.C. § 292f(g). Defendant United States counterclaimed for the amount of the student loan indebtedness allegedly owing the United States, $75,894.82, plus interest, plus attorney's fees and costs. Cass S. Weil appeared for the plaintiff. Roylene A. Champeaux, Assistant United States Attorney, appeared for defendant United States, Jaime Preciado, Assistant Attorney General, appeared for defendant Wisconsin Higher Education Aids Board, and Craig W. Trepanier appeared for defendant United Student Aid Funds, Inc.

This court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(b)(1) and 1334, and Local Rule 1070-1. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(I).

## FACTS

In 1984, Mayra Fe Soler left her home and family in Puerto Rico to attend the School of Dentistry at Marquette University in Milwaukee, Wisconsin. Speaking and understanding very little English, Soler attended school year round, diligently attempting to learn both dentistry and the English language. Having no time for a job and no other resources. Soler accepted the only financial aid Marquette offered her: student loans. She borrowed approximately $130,000. When Soler finally graduated after 5 years, to her shock, the student loans had increased to almost $200,000. From that moment to the present, repaying her student loans has been *the* driving force in Soler's life. Soler has continuously searched for higher paying jobs, explored numerous options to increase her income, worked with chronic back pain which is aggravated by her work as a dentist, sought to cut and minimize her expenses everywhere she could, and gone without the things that many take for granted.

Moreover, despite consistently and timely making monthly payments on her loan debt for almost eight years, including payments totaling approximately $1,400 per month for the three years prior to filing her bankruptcy petition, Soler owed over $285,000 at the time of trial. This notwithstanding that she paid more than $100,000 on her student loan debt prior to filing the petition. With the accruing, compounding interest, in an effort reminiscent of Sisyphus, instead of gaining any ground with her mountain of loan debt, Soler has been going backwards. If she continued to live frugally and contribute $1,400 per month towards her loan debt (which is approximately 36 percent of her after-tax income), she would never completely pay off all her loans, even if she continued working until the day she died.

Mayra Fe Soler was born, and grew up, in Isabela, Puerto Rico. Spanish is her native language. Her father was a family doctor who earned approximately $25,000 to $35,000 annually, and was often paid with food. Her mother took care of the family. Following high school, Soler attended the University of Puerto Rico at Mayaguez for five years, from August 1979 until her graduation in June 1984. She received a Bachelor of Science degree specializing in Biology. Despite receiving her degree "with Honors." Soler received numerous "C's" and several "D's" and "F's." In fact, she was required to repeat several courses including general chemistry, organic chemistry and introduction to calculus, among others. Soler's father paid for college education, which was only $70—$90 per semester (tuition was $5 per credit).

Soler determined that she wanted to become a dentist during her last year in college. She applied to, but was not accepted at, UPR's dental school. She applied to Marquette University, where she was immediately accepted, without an in-

terview, in Spring of 1984. Soler was aware of Marquette's dental school because her own dentist had gone there; other than UPR and Marquette, she did not know of any other schools of dentistry. She was also unaware that Marquette, a private school, cost significantly more than a public school. There was not much of a difference in costs between private and public schools in Puerto Rico.

At the time she was accepted at Marquette, Soler's English language skills were poor.[1] This caused her substantial difficulties at Marquette. Her first year in particular, she did not understand the lectures and thus she would tape them, play them back at night and try to take notes. She had no time for a job because she spent all of her time in class, studying and trying to learn English. Soler stated that there were other Spanish-speaking dental students at Marquette, but the school offered no special programs to aid these students either with their classes, or with student loan debt counseling. Soler attended classes year-round and graduated after five years, although the program was only supposed to take four. Her transcript shows that she failed some courses and was required to repeat them. Further, someone broke into her locker and stole her case study during her final year. The school made her retake the entire year.

Robert Hasel, DDS, an expert regarding the dental industry and education, testified that in the 1980's, dental school tuition and the interest charged on student loan debts skyrocketed. While this was occurring, most dental schools, including Marquette, failed to provide their students with any debt counseling. Today, students receive student loan debt counseling through pro-

grams which started approximately four or five years ago. Dr. Hasel believed that the amount of debt Soler graduated with was "unique" when compared with the average of $75,000 to $80,000 for dental students graduating in 1999. He further stated that he was familiar with Soler's undergraduate academic performance and in his opinion, Soler was not qualified to be admitted to any dental school, primarily for two reasons: (1) her grade point average in basic science courses was very low, and (2) her ability to speak or understand the spoken English language was very poor. Marquette was primarily dependant on tuition for its operating funds, which in turn was funded by student loans. Marquette recruited many students from Puerto Rico.

Following her acceptance at Marquette, the school sent her a financial aid package which included a student loan application, but nothing else. She received no information about grants or scholarships and she had no knowledge of any means to finance her education other than through student loans. She knew nothing about interest on student loans, nor, more importantly, the compounding of that interest. She received absolutely no counseling or assistance whatsoever from Marquette either before or when she signed her promissory notes. Indeed, she never received any loan counseling from Marquette, or anyone else, at any time. After she sent in her first student loan application, Marquette offered her $24,800 in aid, all in the form of student loans. In order to accept or decline the offer, she simply drew a circle around the response. Marquette's procedure for signing promissory notes was akin to an assembly line. On the day the notes were ready for signing the school

---

**1.** Although her English language skills have improved over time, as was evident when she was testifying, Soler still has some minor difficulties in understanding and being understood.

would announce a time that the students needed to go and sign their notes; they stood in a line and when it was a student's turn, the student stated his or her name. The student's promissory note(s) was pulled and given to the student who was told where to sign. Soler did not read her promissory notes and she did not think anyone else did, or had time to do so. Soler stated that this procedure was the same every year.

When she started at Marquette, Soler believed that with a good education, followed by hard work, she would repay her loans. When she first realized the total amount she owed, following graduation, she was shocked. She had not understood that interest not only accrued, but was compounded while she was attending school. She had assumed that her student loans were similar to the ones her college classmates at Puerto Rico had: there was a grace period following graduation, and repayment, and interest accrual, started thereafter. She had no idea that the approximate $130,000 she had borrowed would balloon to nearly $200,000.

She immediately began exploring career options which would allow her to earn a living and afford to make payments on her student loans. She considered returning to Puerto Rico, but because the income for the population is generally much lower there, dental work is not as in demand and Soler could not find any jobs that would have provided a sufficient income. She applied to join the U.S. Army because she understood that they had a student loan forgiveness program. She was not accepted and did not know why. She applied for many jobs but to no avail. She went to various credit counseling agencies, such as Consumer Credit Counseling, but that was not helpful. She decided to apply to the Advanced General Dentistry program at the University of Minnesota because she

believed that an advanced degree would give her an advantage over the other dentist applicants.

Minnesota's AGD program was one year. During that year, Soler worked nights through different temporary employment agencies and earned approximately $16,000 to $18,000. She did not take out any further student loans while earning her AGD, but the money she earned working nights was not enough to allow her to make payments on her loans. She applied for and received a deferment of her student loan payments for that year. She did not realize that while her loans were in deferment, interest would continue to accrue and compound. Soler graduated from the AGD program in 1991.

While she was in the AGD program she began looking for dentist jobs in the private sector. She had passed the Minnesota "Boards" and received her license to practice as a dentist in the state of Minnesota, but the only private sector job she was hired for at that time was as a hygienist, and she was considered on probation, because her employer told her that her Spanish accent might be a problem. A friend of Soler's from the AGD program was also hired by the same employer as a dentist. Soler continued to search for a better job. She sent her resume to potential employers. She gave her resume to her professors at the AGD program. She constantly checked with U of M's job placement office. She scoured the newspaper employment sections. Through the placement office, Soler looked at other states, but Minnesota was obviously her first choice since she had her license here. Through the newspaper advertisements, she learned of an opening with Hennepin County at the Pilot City dental clinic, a public health clinic. She was selected for an interview, but she had to wait one year due to an intervening hiring freeze. In

the meantime, she found part-time employment as a dentist with the St. Paul Public Health Department, earning approximately $17.00 to $18.00 per hour. She supplemented this job with another part-time dentist position with a mobile dental unit that traveled to nursing homes. In 1992, Soler was hired as a dentist at Pilot City, which is where she still works today. At the time of trial, she was earning approximately $79,000 per year.

Soler began making some payments on her loans prior to being hired at Pilot City. She began making regular loan payments after starting at Pilot City, based upon the loan repayment schedules and options the various student loan agencies sent her. She chose her repayment options based upon her income and what she believed she could afford to pay. On November 17, 1993, Soler filed a petition under Chapter 13 of the Bankruptcy Code. The primary reason she filed was to discharge credit card debt which she had accrued due to charges for gas, food, rent and an airline ticket to return to Puerto Rico for her father's funeral in September 1990. At that time, she made no attempt to discharge her student loan debt because she hoped that she could improve her financial situation and pay off those loans.

When Soler started at Pilot City, she anticipated getting a pay increase, by going up to the next classification in Hennepin County's step process, of approximately five percent each year. However, she reached the maximum step level (step 10) in 1996, and since then, her only salary raises have come from small cost of living increases, usually about three percent per year, subject to the discretion of the county. There was at least one year in which

they received no cost of living increase. The only further raises Soler will realize are cost of living increases or if the County Board of Supervisors votes to increase the pay scale.

Soler and her supervisor, Dr. Babcock, spent many years attempting to obtain a Health Professional Shortage Area designation for the Pilot City dental clinic. The doctors and dentists who work at HPSA designated clinics are eligible for loan forgiveness (by the federal government). Pilot's City's medical clinic has HPSA designation, but its dental clinic does not. However, the efforts to obtain such a designation for Pilot City's dental clinic proved fruitless. In fact, very few public health dental clinics nationwide have a HPSA designation. Soler also contacted the few dental clinics across the country which do have the HPSA designation to determine whether she could get a job at one of those clinics. Soler learned, however, that: many of those clinics paid less; some had no benefits such as she is receiving at Pilot City [2]; she would need to pass the board examinations to be licensed in another state and, even if she did obtain a position, there was no guarantee that she would be eligible for the loan repayment program as only a limited number of these spots are available. In addition to the HPSA designation, Soler and Dr. Babcock have also unsuccessfully worked to try to reclassify her position in order to obtain further step increases.

In addition to these efforts to increase her income, since becoming employed at Pilot City, Soler has not stopped her search for a higher paying job. She continues to check with the University of Minnesota's dental school job placement

---

2. The benefits which Soler receives, or is eligible for, from Hennepin County include: health insurance; long-term disability (but no short term); a retirement plan; a § 457(b) plan (similar to a 401(k) plan, but Soler has not been able to afford to make contributions); $20,000 in life insurance and paid annual and sick leave.

office. She continues to check employment advertisements in newspapers and other sources. She has not just searched, but has applied for other positions, and she received offers from Health Partners and "Apple Tree," an organization which serves the elderly population. However, both of these offers were lower than what she is earning at Pilot City. Soler is continuously looking for a better paying job and considers all options because thinking about how to repay her student loans is a constant factor in her everyday life.

Dr. Hasel testified that he believed Soler has done an excellent job of looking for a better paying position. He also did not believe that she could find a higher paying position. He stated that dentist associates in private practice do not earn more than she does: they typically earn thirty percent of their gross billings—which averages $200,000, and they are usually responsible for their own benefits. The only way Soler could appreciably increase her income is by owning her own practice. But this avenue is virtually impossible for Soler given her lack of capital and huge student loan debt load (which prevents her from borrowing any money), and the number of hours she is able to work due to her health.

Soler is working a reduced 36–hour work week because of chronic back pain. She has been working this schedule since 1997 upon the recommendation of a physical therapist. Her back pain began when she was attending the AGD program in 1990–1991. She went to physical therapy at that time, and since then, she has been treated by a physician and, since 1999, she has been under the care of a chiropractor, Richard Printon, D.C. In 1999, she sought treatment at Hennepin County Medical Center when her feet went completely numb and she was experiencing a significant amount of pain. Following an MRI,

Dr. Henry Smith diagnosed her with a degenerated lumbar spine and referred her to Dr. Printon, who is also affiliated with HCMC. In addition to the degeneration of her lumbar spine, Dr. Printon diagnosed Soler with a sacroiliac sprain strain and a spinal disc bulge. He has been treating her with chiropractic adjustments, physical therapy and daily exercises. In addition, Dr. Smith prescribed Celebrex for her inflammation and pain, and she sometimes takes prescription Motrin. Soler also testified that she frequently takes Tylenol P.M. because she has difficulty sleeping at night.

Dr. Printon recommended that she reduce her work load to 32–36 hours per week in order to reduce the stress on her spine. Her job as a dentist and flexing forward while sitting places a strain on her spine. As to Soler's prognosis, Dr. Printon maintained that, given her occupation as a dentist, he does not believe that her condition will ever be completely healed and she will suffer from dysfunction throughout her life. His hope is, however, to manage her condition and lessen the episodes of acute pain flare-ups. Future treatments may include Prednisone, steroids, spinal injection or surgery. Dr. Printon further testified that, if she changed to an occupation that did not require the type of body movements and positions she now uses, it would be possible for her back to fully recover.

In addition to her chronic back pain, in the past two years, Soler has had a hysterectomy, and suffered from mononucleosis and a lesion on her lung. Although these were not good years for her health-wise, all of these health problems were, hopefully, temporary. But the pain which Soler has lived with for the past ten years, the pain that most likely never will go away as long as she continues to work as a dentist, is her chronic back pain: Soler cannot

recall a day working as a dentist without back pain.

Because Soler is working a 36–hour work week, her pay is 90 percent of what she would otherwise be earning for her step level. Although Soler's pain and discomfort would be lessened if she cut back her work hours even further, she has chosen to work the maximum recommended by her health providers in order to earn the most she can to pay towards her student loans.

Soler's monthly income, after taxes and other mandatory deductions, is approximately $3,800 per month, while her monthly expenses, without the student loan payments, are approximately $2,490. Prior to filing bankruptcy, she had been paying approximately $1,400 per month to the student loan agencies. Her expenses are not excessive but are instead, very reasonable. In fact, Soler is living an extremely frugal life.[3] Soler is 40 years old. Yet, she rents a bedroom in someone else's house—and she has done this for the past six years, all in an effort to afford her student loan payments. She lives there with what she calls her only family here in the United States, a small dog. She pays $600 per month to rent the room. She also shares the kitchen and bathroom with the home owner. Soler has tried to find something else, a place of her own, but she cannot find anything she can afford in the Minneapolis/St. Paul area. She does not consider this living arrangement to be her "home," and she is clearly embarrassed by where she lives; so embarrassed that she never has anyone over to visit because, in her words, "they don't need to know how Dr. Soler . . . live[s]." [4]

Soler has taken several other steps to save expenses or go without. Although eligible for Hennepin County's equivalent of a § 401(k) plan, Soler makes no contributions to this plan and thus, she is forfeiting a significant source of retirement income. The county offers three health plans. Soler chose the one which costs her the least for monthly premiums. Because of her back condition and other health needs, she incurs co-pay charges for things such as office visits and prescription drugs. She does not belong to any professional or social clubs, not even the American Dental Association, which she believes harms her professionally. She testified that she cannot afford to purchase tickets to attend local theater, orchestra, sporting or other such events. She stated that she does not really have any social life. She would like adopt a child, but believes she cannot afford children. Her material possessions are extremely spartan. She basically has the same few pieces of furniture that she had in dental school. Soler owns an unfinished dresser, which she assembled herself, a bed and an old 19 inch television. She hardly ever buys any new clothes and her wardrobe is limited. Her monthly

3. In its trial brief, even defendant United States conceded that Soler "lives frugally."

4. After rent, Soler's next highest monthly expense listed in her Schedule J is $500 for food. Although, at first glance, this may seem high, it is reasonable considering that: (1) due to the nature of her job she usually purchases her lunches on the go, and (2) she shares the kitchen with the owner of the room that she rents and she does not feel comfortable using the kitchen facilities or dishes or cookware as these do not belong to her.

Soler also has a monthly car payment of $396 for a 1999 Jeep Laredo which she purchased in 1998 to replace an eleven year old vehicle which had become unreliable and broke down several times, including in a bad neighborhood late one evening. Soler will be making payments on the Jeep for about an additional three and one-half years, at which time she may need another vehicle, or, her vehicle repair and maintenance expenses will likely increase.

budget includes $50 for clothing and $60 for laundry and dry cleaning. The bulk of her clothing allowance is for white professional jackets which she must replace frequently.

When her father died on September 25, 1990, Soler's mother was left with nothing but debt. Until this past year, she had been sending her mother small amounts, totaling approximately $1,000 per year, for her mother to live on (the cost of living is very low in Puerto Rico, and her mother sews her own clothes, so the money is primarily for food). Soler would like to be able to help more, but cannot. This year and last year, she has been unable to afford to help support her mother, even in this limited amount.[5]

Soler's family members, including her mother and siblings, live in Puerto Rico. However, other than returning for her father's funeral and on one occasion when her mother had surgery, Soler has not been able to afford the air fare to visit, to attend family functions, or for Christmas or other celebrations. Soler could not recall the last time she spent Christmas with her family. She has also been unable to afford to take vacation trips. She did take one weekend trip to Lutsen, Minnesota, one or two years ago as part of a work activity, but the cost was very low.

After her bankruptcy filing in 1993, Soler began saving money which she used to establish a certificate of deposit. Over a period of about seven years, she accumulated a CD of $20,000. She explained that, following her first bankruptcy filing, she never wanted to be in that financial situation again, so she began saving some funds for emergencies and in case of illness (since she has no short term disability insurance). In 1999, she cashed in the CD and used $10,000 to $12,000 of the proceeds as a down-payment on a vehicle, and the remainder has been depleted in payments to her attorneys for this bankruptcy case.[6] At the time of trial, she stated that she had approximately $1,000 in savings, which she intends to use to help pay her approximate $2,300 nondischargeable tax debt.

### The Loans

Soler filed a petition under Chapter 13 on February 7, 2000. At the time she filed, she was paying the student loan agencies a total of $1,361 per month,[7] which constituted almost 36 percent of her after-tax monthly income. There are three debts at issue in this case. They are currently owed to the defendants, United Student Aid Funds, Inc., the United States Department of Health & Human Services, and Wisconsin Higher Education Aids Board. The loans held by the U.S. and WHEAB were made under the Higher Education Assistance Loan (HEAL) program[8] and are guaranteed by the HEAL program. The Student Loan Marketing Association, or Sallie Mae, was the original lender of the loan now held by USAF.

---

5. As her mother's primary source of support, Soler claimed her mother as a dependent on her tax returns. Since she no longer supports her mother, she no longer claims this exemption, thus increasing her tax liability.

6. Soler estimated that she has paid her bankruptcy attorney a total of $17,000 to $18,000 (she pays what she can and has missed some payments), and she probably owes about another $5,000.

7. Since filing, the funds which would have gone towards these payments have gone, initially to the Chapter 13 trustee, and then to pay her attorneys' fees and for her to live on when she was on extended, unpaid medical leave last year due to mononucleosis.

8. See 42 U.S.C. § 292.

*WHEAB Loan Debt*

The WHEAB loans originated with two promissory notes: one dated September 27, 1984, in the original principal amount of $15,000, and the other, dated September 27, 1985, in the original principal amount of $20,000. Thus, the total principal amount borrowed by Soler was $35,000. The 1984 note had a pre-repayment fixed interest rate of 14.968%, and a post-repayment fixed rate of 12.25%. The 1985 note's pre-repayment fixed interest rate was 13.589%, and the post-repayment rate is 11%. For both notes, accrued but unpaid interest has been continuously capitalized every six months. Soler made some payments on her WHEAB debt, totaling $4,697.40, prior to commencing regular monthly payments in June, 1993, in the amount of $777.08. The monthly payments were scheduled to increase to $965.43 after two years. In 1994, however, Soler requested and was granted an income-contingent repayment schedule which reduced her monthly payments to $231.00 per month. This is the amount she was paying until filing her bankruptcy petition. Until one or two years prior to filing, Soler did not realize that the $231 monthly payment was insufficient to even cover the interest, nor did she realize that the principal amount she owed WHEAB was increasing, rather than decreasing.

Notwithstanding having paid WHEAB $28,675.60 from June 1992 to February 1, 2000, and notwithstanding that the original amount borrowed was only $35,000, when she filed for bankruptcy in February 2000, Soler owed $134,674.38 on the WHEAB debt; by January, 2001, that total had increased to $149,686.63. Further, at the time of trial, the two notes were accruing interest in the approximate amount of $47.89 per day, or $1,485 per month. Even taking into consideration a possible reduction in her other debt load (either through repayment and/or a discharge of other student loan debt), the evidence demonstrates that if Soler continued to make payments towards the WHEAB loan for the remainder of her life, she would never be able to pay this debt off in full. It is unlikely that she could even afford to service the interest, which would cause this debt to continue its upward spiral.

About one or two years prior to filing her bankruptcy petition, Soler realized, upon inspection of her pay statements from WHEAB, that even though she was making regular, timely monthly payments to WHEAB, the total amount she owed was increasing rather than decreasing Soler then requested a payment history from WHEAB because she believed that perhaps they were not crediting all her payments. Upon learning that her payments were applied, Soler began repeatedly contacting WHEAB to determine exactly how much she had to pay to decrease her principal balance. No one at WHEAB ever informed her that she would have to increase the amount of her monthly payments, nor how much she would need to increase her payments, in order to ever pay off this loan.

*U.S. Loan Debt*

The student loan debt owed to the U.S. arises from three promissory notes, in the original principal amounts of $13,500, $17,690 and $13,810, made in the years 1986, 1987 and 1988, respectively. The total amount initially borrowed was therefore $45,000. The pre-repayment interest rates for these notes were not fixed and varied from over 12% to over 19%. Post-repayment, the rate varied from 9.0% to 10.75%, and was 8.75% in December 2000. The interest accrues daily and is compounded every six months. Soler's monthly payments on the U.S. held loan were $662.75 at the time of filing her bankrupt-

cy petition, and they had been increasing over time.

From November 1992, through January 2000, Soler paid $41,294.79 on this debt. On September 21, 2000, she still owed a balance of $75,894.82, and, on March 1, 2001, she owed over $79,000. Interest is accruing at approximately $529 per month. If she were to resume monthly payments at her pre-bankruptcy scheduled rate and interest, she would repay this loan in approximately twenty-two years.

*USAF Loan Debt*

The loan now held by USAF is a SMART loan which originated with the consolidation of several smaller loans into one SMART loan in June 1992. The original principal amount of this loan was $52,038.82, and the lender was Sallie Mae. USAF guaranteed the note and now holds all of Sallie Mae's rights in the note. Soler applied for the consolidation in an effort to reduce her payments by reducing the interest rate. She was unable to include her U.S. or WHEAB loans in the consolidation. The interest rate is fixed at 9.0%. It is unclear from the evidence how frequently the interest is compounded. Monthly payments at the time of trial were $467.20, and, as with the HEAL debt held by the U.S., the payments have increased over time.

From 1992 until January 2000, Soler paid a total of approximately $33,900 on this debt. However, by January 3, 2001, she still owed $56,449.05, and interest is accruing in the approximate amount of $415 per month. In October 1999, Soler still had another 26.8 years remaining to pay on this loan. If she were to resume scheduled payments now, it would take her approximately 27 to 30 years to repay the

loan, and Soler would likely have to continue working until age 70 in order to attempt to do so.[9]

*Total Student Loan Debt*

Here is a summary of Soler's student loan debt balance and payment history:

| Agency | Original Loan Principal | Payments | Balance |
|---|---|---|---|
| WHEAB | $ 35,000 | $ 28,675 | $149,686 |
| U.S. | $ 45,000 | $ 41,294 | $ 79,000 |
| USAF | $ 52,038 | $ 33,900 | $ 56,449 |
| Total: | $132,038 | $103,869 | $285,135 |

Soler borrowed a total of approximately $132,000 and she has made over $103,000 in student loan payments. At the time of trial, Soler owed a total on all her student loans of at least $285,135. Even if she were to immediately resume monthly payments of $1,400, she would likely owe a combined total of over $300,000 in a very short time, if she does not already.

*Attempts to Negotiate Student Loan Debt*

By 1999, Soler's student loan debt total had reached well over $200,000. Soler had been cutting expenses at every corner ever since becoming a dentist. She had constantly searched for a better paying job. Her five percent yearly pay increases stopped when she reached step 10, and the only likely future increases are from sporadic COLA increases which, in past years, have not kept pace with the actual cost of living. Soler's real income has decreased while her student load debt has increased. Soler thus attempted to contact WHEAB and the other loan agencies to see if anything could be worked out which would allow her to repay her loans within the income limits she has and will have. The loan agencies were essentially non-responsive.

After failing to get anywhere on her own, Soler hired an attorney to negotiate

---

9. If she did continue working until age 70, or beyond, it is unlikely that she could do so with Hennepin County because, according to the testimony of Dr. Babcock, the county has a mandatory retirement age of 67 years.

with the student loan agencies, explore obtaining an HPSA designation for the Pilot City clinic, and, if everything failed, to explore bankruptcy. Her attorney confirmed that the HPSA designation was a virtual impossibility. The student loan agencies were no more willing to negotiate a workable, or any, financial solution with Soler's attorney than they were with Soler herself. In a response letter dated October 22, 1999, WHEAB stated that, because the HEAL program is federally mandated, "there is really nothing that [WHEAB] can do to negotiate a lower rate of repayment." The WHEAB also informed Soler's counsel that the income-contingent repayment schedule, under which Soler had been paying $231 per month for the past five years, was only to have lasted twelve months. However, apparently through oversight, the WHEAB never corrected this or informed Soler to begin paying more again.

Attempts to negotiate with Sallie Mae, which then was the holder of both the HEAL loans and the SMART loan now held by the U.S. and USAF, respectively, were equally unavailing. In letters dated October 6 and October 29, 1999, Sallie Mae stated that Soler was obligated to pay the full amount of principal and interest owed, and that the "obligation is not negotiable." Sallie Mae also indicated that the only relief possible would be if Soler filed bankruptcy and sought to discharge the debt as a hardship.

### Chapter 13 Filing

Faced with prodigious, and escalating, student loan debt, Soler filed a bankruptcy petition under Chapter 13 on February 7, 2000. Her schedules listed no real property and no unencumbered or non-exempt personal property.[10] In Schedule E, she listed priority unsecured debts owing to federal and state taxing authorities for the year 2000 income taxes in "unknown" amounts. At trial, Soler testified that she owes the IRS approximately $2,300 for her 2000 income tax. Soler's schedule of general unsecured claims totaled approximately $250,100, all for student loans.

In her Chapter 13 case, Soler proposed a plan which would have paid the student loan agencies $1,400 per month for sixty months. Thus, the loan agencies would have received an additional $84,000 (minus the Chapter 13 trustee's fees) on top of the over $100,000 Soler had already paid. Soler testified that, although continuing to funnel $1,400 of her monthly income for another five years would have been very difficult (particularly since her income has not kept pace with the cost of living since 1996), she would have been willing to do this if it would finally free her from the student loan burden. In conjunction with the plan, Soler commenced an adversary proceeding seeking a determination that, following completion of her plan payments, the remaining student loan debt would be discharged. The United States brought a motion to dismiss Soler's complaint as being premature. I granted this motion, determining that the adversary proceeding was not ripe.[11] Thereafter, Soler converted her Chapter 13 case to Chapter 7 and filed this adversary proceeding.

Having observed the witness and her demeanor on the stand, and having heard her testimony, I find that Soler is very credible. Filing this bankruptcy in an at-

---

**10.** Amended Schedule B listed personal property valued at approximately $48,000, the majority of which consisted of Soler's encumbered vehicle, valued at $19,500 (against $17,000 in secured debt and the remainder claimed as exempt), and a mandatory county pension plan, valued at $19,000, which Soler listed for "information" purposes claiming that this was not property of the estate.

**11.** *See Soler v. United States (In re Soler)*, 250 B.R. 694 (Bankr.D.Minn.2000).

tempt to gain some relief from her crushing debt load was obviously not an easy choice for Soler. It is clear from her testimony and demeanor that she is ashamed that she had to resort to bankruptcy. But it is also clear that student loan debt is crushing her spirit and damaging her health. She is emotionally fragile. Soler desperately wants to repay her student loan debts but she could not find one more expense to out, one more thing to give up nor any other way to increase her income. She sees no way out nor any light at the end of the tunnel. Despite her income and education, Soler has been living, at best, like a college student due to the enormous burden of her student loan debt. If none of her student loans are discharged, she would likely continue to live in this manner for the rest of her life, and still, she would never be able to pay her loans in full. She would likely never have children, never have a place of her own, never allow her back an opportunity to mend, and never spend Christmas, or any other holidays, with her family. Soler does not desire to simply shed her student loan debt in order to acquire material possessions over her lifetime; she desires an end to her constant burden so that she may have a life. Since graduating from Marquette, Soler has dedicated her life to repaying her student loans. Soler works to pay her student loans, and paying her student loans is the focus of her life. Given the existence she has, it is not an exaggeration to observe that Soler is essentially an indentured servant.[12] Without relief, Soler's student loans will continue to be the dominant, driving force in her life, until the day she dies.

## DISCUSSION

The U.S., WHEAB and the debtor stipulate that the dischargeability of the U.S. and WHEAB held loans is determined exclusively under 42 U.S.C. § 292f(g).[13] The dischargeability of the loan held by USAF is governed by 11 U.S.C. § 523(a)(8).

### "Unconscionability" Under 42 U.S.C. § 292f(g)

The WHEAB and U.S. loans were made under the HEAL program and are guaranteed by the HEAL program. Congress created the HEAL program to enable health profession students the means to borrow sufficient funds for their graduate school education. See generally, 42 U.S.C. § 292, et seq. A loan insured under the HEAL program may be discharged in bankruptcy "only if such discharge is granted—

(1) after the expiration of the seven-year period beginning on the first date when repayment of such loan is required, exclusive of any period after such date in which the obligation to pay installments on the loan is suspended;

(2) upon a finding by the Bankruptcy Court that the nondischarge of such debt would be unconscionable; and

(3) upon the condition that the Secretary shall not have waived the Secretary's rights to apply subsection (f) of this section to the borrower and the discharged debt."

42 U.S.C. § 292f(g).

All three of the requirements must be met in order for a HEAL loan to be discharged. See, e.g., United States v. Wood, 925 F.2d 1580, 1582 (7th Cir.1991).

---

**12.** While Soler does not share the physical cruelty suffered by those who bought their way to the United States by indenturing themselves, the indentured servants of our country's past at least had the prospect of an end to their servitude. Soler has no such prospect.

**13.** This section was formerly codified at 42 U.S.C. § 294.

In this case, there is no dispute that the required seven-year period has passed, nor that the Secretary has not waived certain set-off rights. Thus, the only issue is whether the failure to discharge the WHEAB and U.S. held loans would be "unconscionable." The burden is on the debtor to prove that failure to discharge the HEAL loans would be unconscionable. *Steuber v. United States Dep't of Educ. (In re Steuber)*, 200 B.R. 31, 33 (Bankr. W.D.Mo.1996) (citing *Wood*, 925 F.2d at 1583).

■■ Although "unconscionable" is not defined in § 292, the majority of courts have held that it is a more stringent standard than the "undue hardship" standard of Bankruptcy Code § 523(a)(8). *See Rice v. United States (In re Rice)*, 78 F.3d 1144, 1148–49 (6th Cir.1996); *Wood*, 925 F.2d at 1583; *Kline v. United States (In re Kline)*, 155 B.R. 762, 766 (Bankr.W.D.Mo.1993). This is in keeping with the belief that Congress intended to restrict the circumstances under which HEAL loans could be discharged, out of concern that medical students were obtaining lucrative careers while seeking to shirk their student loan obligations. *See Rice*, 78 F.3d at 1148.

■ In fashioning a standard, courts have adopted the ordinary usage of the term, "unconscionable," finding that it means: "shockingly unfair, harsh or unjust," "excessive, exorbitant, lying outside the limits of what is reasonable or acceptable." *See Rice*, 78 F.3d at 1149; *In re Malloy*, 155 B.R. 940, 945 (E.D.Va.1993), *aff'd*, 23 F.3d 402 (4th Cir.1994); *Kline*, 155 B.R. at 766. The Eighth Circuit has not interpreted § 292's "unconscionable" standard, but as many other courts have done, I look to the Sixth Circuit's opinion in *Rice*, 78 F.3d 1144 for guidance.

■ The *Rice* court found that adopting one single test of unconscionability would be inappropriate, and instead favored a totality of the circumstances examination. *Rice*, 78 F.3d at 1149. Under this examination, the court determined that the bankruptcy court should consider the following objective factors, the debtor's: 1) income, 2) earning ability, 3) health, 4) educational background, 5) dependents, 6) age, 7) accumulated wealth, and 8) professional degree, including whether the debtor has obtained employment commensurate with her education. *Id.* In addition, courts should also consider: the amount of the debt and the rate of interest; the debtor's claimed expenses and living standard, including whether the debtor has taken steps to minimize the expenses; whether the debtor has attempted to maximize her income and whether the debtor can supplement that income through part-time employment; whether, and to what extent, the debtor's situation is likely to continue or improve; and, the debtor's good faith, including the debtor's efforts to repay the HEAL loans and the debtor's financial situation when making any repayment efforts. *Rice*, 78 F.3d at 1149–50. In conjunction with these factors, some courts also require a "certainty of hopelessness that future payments cannot be made, based on the presence of unique or extraordinary circumstances which would render it unlikely that the debtor ever would be able to honor his obligations." *Steuber*, 200 B.R. at 34 (citation omitted).

■ While not interpreting unconscionable within the context of § 292, the Eighth Circuit has expressed a standard for determining whether a contract, or a contract provision, is unconscionable, using a totality of the circumstances test. *See Hines v. United States (In re Hines)*, 63 B.R. 731, 736 (Bankr.D.S.D.1986) (citing *Geldermann & Co. v. Lane Processing*, 527 F.2d 571 (8th Cir.1975)). In *Geldermann*, the Eighth Circuit held that, in

examining the totality of the circumstances, "[t]wo important considerations are whether there [was] gross inequality of bargaining power between the parties to the contract and whether the aggrieved party was made aware of and comprehended the provision in question. . . ." *Geldermann,* 527 F.2d at 575, *quoted in Hines,* 63 B.R. at 736.

With these factors in mind, I turn to the two HEAL loans.

### WHEAB Loan

■ Having carefully reviewed and considered the evidence, having heard the testimony offered and having examined the totality of the facts and circumstances, I find that the nondischarge of Soler's WHEAB loan would be shockingly unfair, harsh and unjust, and lying outside the limits of what is reasonable or acceptable. *See Rice,* 78 F.3d at 1149; *Malloy,* 155 B.R. at 945; *Kline,* 155 B.R. at 766. In other words, the failure to discharge the WHEAB loan would be unconscionable under 42 U.S.C. § 292f(g).

The debtor's income is approximately $79,000 per year. She is employed as a dentist, earning the most she can using her degree and skills. She is at the highest step level of her employer's pay scale, and the only future raises she is likely to receive are through COLA increases or if the county votes to increase the pay scale. Soler has exhaustively searched for a higher paying job, and continues to search, but it is not likely that she will find another position which pays more, in income and benefits, than she is now earning. Soler has chronic, acute back pain caused, in part, by degeneration of her lumbar spine, which prevents her from obtaining supplemental employment or from working more hours. She is already working the maximum number of hours recommended by her treating doctor, despite the knowledge that working the lesser recommended number of hours, or finding employment that didn't require the type of sitting/flexing/bending she must do, would likely improve her health. It is extremely unlikely, if not impossible, that Soler's income will increase to a level that would allow her to pay her WHEAB debt in full.

Soler has taken numerous steps to minimize her expenses. Indeed, even one of the HEAL defendants, the U.S., admitted that Soler "lives frugally." Soler, a 40 year old dentist, lives in a rented room in someone's house, sharing a kitchen and bathroom with the home's owner. She does not consider this to be her home and fears she may never have a place to call her own—not even an apartment. She has very few material possessions and most of her furnishings were obtained when she was in dental school. She does not contribute to her employer's 401(k) plan equivalent and she chose the least expensive health insurance offered. Soler has virtually no social life, she does not take vacation trips and she cannot even afford to visit her family for important holidays, nor for any occasion. When asked what she would do with the funds if she was not spending such a large portion of her monthly income on student loan debt, Soler stated that she would like to have children. She would like to be able to see her family at Christmas, to have a kitchen table where she could drink coffee and read the newspaper, to have a place of her own, not necessarily a house, where she could have family and friends come and visit, perhaps have a barbecue and a garden, and to have a little privacy. She stated also that would like "a little bit of a social life."

Soler does not have any accumulated wealth. At the time of trial, she had no dependents, although she would like to have children and she has assisted her mother with small amounts in the past.

She would like to be able to help her mother, who was left with debt when her father died, and she is very concerned that she does not have the means to assist her mother and does not have a place where her mother could come and live with her if necessary.

The evidence clearly demonstrates the debtor's good faith, including her substantial efforts to repay her WHEAB loan. Unlike the debtors in the majority of the cases cited by defendants, Soler has not attempted to shirk her student loan obligations. In fact, she has spent her post-dental school life constantly trying to find the means to repay her debt. At the time she filed her bankruptcy petition, Soler was paying approximately $1,400 per month, or 36 percent of her after-tax income, to the student loan agencies. The amount she was paying monthly had increased over the years, but she was unable to afford to increase her payments to WHEAB.

The amount of Soler's debt to WHEAB is enormous and growing ever larger. Despite having originally borrowed · only $35,000, and despite having made payments to WHEAB totaling $28,675, Soler owed WHEAB approximately $150,000 at the time of trial. This debt originated from two promissory notes, which had pre-repayment interest rates of 14.968% and 13.589%, and their post-repayment fixed rates are 12.25% and 11.0%. Interest is currently accruing at the rate of $1,485 per month. Soler does not have sufficient income, and never will have sufficient income, to even hope to service the interest on this debt, much less make any pay-

ments towards the principal amount owing, which will continue to increase. There is a "certainty of hopelessness" that Soler could ever pay the WHEAB debt in full. *See Steuber*, 200 B.R. at 34. As Soler testified at trial, she would not "be sitting down in this [witness] chair, if [she] wasn't sure that [she had] tried everything."

As further evidence of her good faith, Soler attempted to negotiate with WHEAB, and the other loan agencies, regarding reducing her debt load and/or repayment plans that work with her income limits. This proved fruitless. In WHEAB's case, they replied that they could not negotiate Soler's loan debt because the HEAL program is federally mandated. During this attempted negotiation, it was also learned that the income-contingent repayment plan, under which Soler had paid $231 per month for the prior five years, was only to have lasted twelve months. However, apparently through oversight, WHEAB never corrected this or informed Soler to begin paying more after the first twelve months expired. During this five-year period, unbeknownst to her, Soler was not even servicing the interest. The interest was compounded and added to the spiraling principal total; placing repayment of her WHEAB loan further out of reach.[14]

*Matthews v. Pineo,* 19 F.3d 121 (3d Cir. 1994), examined unconscionability under 42 U.S.C. § 254*o*(d)(3)(A), concerning the National Health Services Corps Scholarship Program. Under this program, medical students receive scholarships in exchange for contractual commitments to provide

---

**14.** I intend no criticism of WHEAB. It applied a program which did not require it to inquire as to a borrower's understanding of the ramifications of the loan or appreciation of its implications. It was likewise under no obligation to determine if Marquette was admitting students who were apparently unqualified academically or even linguistically. Unfortunately, however, even WHEAB's attempt to help, by reducing Soler's monthly payments, only exacerbated her situation by disguising the hopelessness of her situation and aggravating it (assuming that there can be degrees of hopelessness).

one year of "obligated service" for each year of financial support. *See generally,* 42 U.S.C. § 254. In *Matthews,* the debtor refused to fulfill her service obligation, which was still an option offered her by the NHSC, and the bankruptcy court determined that the enormous amount of the debtor's repayment obligation, nearly $400,000, which the debtor had "a near impossibility" of paying, warranted a finding of unconscionability. *See Matthews,* 19 F.3d at 123 (citing *Matthews v. United States (In re Matthews),* 150 B.R. 11, 14 (Bankr.W.D.Pa.1992)). The bankruptcy court also maintained that it was not a reasonable option to require the debtor leave her home and practice and uproot her children to relocate for a few years in order to fulfill her service obligation. *See Matthews,* 19 F.3d at 123. On appeal, the Third Circuit reversed, holding: 1) that it was not unconscionable to require the debtor to fulfill her service obligation, and 2) a large debt, by itself, is not unconscionable, instead, the court should have examined whether it was "'unconscionable' to require [the debtor] to take any available steps to earn more income or to reduce her expenses" so that she could afford to pay the full obligation. *Id.* at 124.

Soler, by contrast, was willing to go virtually anywhere, via the U.S. Army or a HPSA designated clinic, where she could receive assistance with her student loan obligations. She has also taken all reasonable, available steps both to maximize her income and to reduce her expenses. It would be unconscionable to require her to work additional hours to earn a few more dollars to send WHEAB, at the expense of her health.

WHEAB cites the case *Barrows v. Ill. Student Assistance Comm'n (In re Barrows),* 182 B.R. 640 (Bankr.D.N.H.1994), as being allegedly analogous to the instant matter. In *Barrows,* the court found that the non-discharge of debtor's HEAL loan was not unconscionable where: the debtor, a dentist, had made only eight payments on her HEAL loan totalling just over $2,100 during an eleven year period; the income generated from her own private practice was stable, growing and likely to improve; and, the loan entities had made various repayment and partial forgiveness offers, but the debtor failed to respond to any of the proposals, failed to make any counter-offers, and failed to actively negotiate with any lender. *See Barrows,* 182 B.R. at 643–48, 650–52. Indeed, the offers made by the loan agencies appeared to be very reasonable. For instance, the United States, which was owed approximately $186,000 on a HEAL obligation, offered to reduce the debt total to $173,818, lower the interest rate to the lesser of 6.21% or the federal judgment rate and proposed a repayment term of fourteen years, with payments tied to the anticipated increasing income from the debtor's private dental practice. *Id.* at 644. Another loan agency offered to cut her debt obligation by 50% and reduce the interest rate to zero percent. *Id.*

In contrast, Soler has never been offered any such deals. In fact, the evidence demonstrates that while Soler was willing, and tried, to actively negotiate with the loan agencies, the agencies, including WHEAB, have been unwilling or unable to negotiate a manageable repayment and/or forgiveness schedule with Soler. Further, Soler has made significant payments on her obligations, and she does not have her own private dental practice (where she could anticipate an increasing income) nor is it feasible for her to do so.

Similarly, the other cases cited by the HEAL defendants are distinguishable. In *Rice, Malloy, Hines, Steuber,* and *In re Green,* the debtors were all healthy with no demonstrated physical or mental limita-

tions impairing their income-earning potential. *See Rice,* 78 F.3d at 1150; *Malloy,* 155 B.R. at 943–44; *Hines,* 63 B.R. at 733; *Steuber,* 200 B.R. at 33, 35; *In re Green,* 82 B.R. 955 (Bankr.N.D.Ill.1988). In *Hines* and *Steuber,* the debtors had failed to make any loan repayments. *See Hines,* 63 B.R. 731; *Steuber,* 200 B.R. at 32–33. In *Rice,* the debtor had made only $55.00 in payments; in *Malloy,* the debtor had not made any voluntary payments in over eight years, and in *In re Emnett,* the debtor had made only token payments. *See Rice,* 78 F.3d at 1147; *Malloy,* 155 B.R. at 942–43; *Emnett v. United States (In re Emnett),* 127 B.R. 599, 601 (Bankr. E.D.Ky.1991). In *Malloy,* the debtor had made no efforts to locate a better paying job in years, while in *Steuber,* the debtor, a chiropractor, had never attempted to find a higher-paying chiropractic job. *See Malloy,* 155 B.R. at 947; *Steuber,* 200 B.R. at 33.

Some other significant factors contributing to courts' conclusions that unconscionability had not been shown include: the debtor and his wife were gainfully employed, their expenses had made a " 'disturbing' increase over a short period" with virtually no attempt by the debtor to show that they had attempted to minimize expenses, and there was no evidence that the debtor could not afford to increase his repayment efforts (*Rice,* 78 F.3d at 1150–51); the debtor had made no attempt to contact the loan agency to discuss a manageable repayment schedule, and there was no record to support the bankruptcy court's findings that the debtor had a "problem in society" nor that the debtor had "difficulty in performing" (*Malloy,* 155 B.R. at 946–47); the debtor's spouse had accumulated wealth, including a home and two farms, and the court questioned the debtor's credibility finding his testimony evasive, inconsistent with prior testimony and answers that were not "straightfor-

ward" (*Steuber,* 200 B.R. at 35–36). Further, in none of the cases surveyed did the debtors make the type of significant repayment efforts Soler has made (in fact, none come close), while simultaneously, the student loan obligations grew as enormous as Soler's.

█ Finally, regarding Soler's understanding of what she was agreeing to when she signed her promissory notes, it is clear from her testimony that, based in large part on the language barrier, her complete lack of financial sophistication, and the lack of any assistance or loan counseling from her dental school or the loan agencies, she did understand nor comprehend the effect of the interest rates and the compounding interest. *See Hines,* 63 B.R. at 736 (discussing *Geldermann,* 527 F.2d at 575). Soler credibly testified that she did not even understand that the interest was capitalized while she was attending dental school, nor did she realize, until years later, that while on the income-contingent repayment plan, her debt to WHEAB was increasing in gigantic proportions because she was not making monthly payments sufficient to service the interest, much less reduce the principal owed. As she stated at the trial on this matter: "[I]f I knew what I was signing up 16 years ago, . . . that this is the way I have been living, I would . . . absolutely won't be signing anything. I would be taking an airplane back to Puerto Rico. I would be much better off. This is no life."

It is the Court's belief that Congress created the 'unconscionable' standard for use with HEAL loans to prevent a borrower who obtains a medical degree with a HEAL loan and is on the threshold of a prestigious, high paying medical career, from easily discharging the HEAL loan in bankruptcy. The Court cannot believe that it was the intent of

Congress to further torment an unfortunate person like the Debtor herein.

*Nelson v. Pa. Higher Educ. Assistance Agency (In re Nelson),* 183 B.R. 972, 978 (Bankr.S.D.Fla.1995). Reviewing the totality of the circumstances, I conclude that the nondischarge of Soler's WHEAB debt falls within the meaning of "unconscionable" as contemplated by Congress. Accordingly, this debt shall be discharged.

### U.S. Loan

 I find that the nondischarge of the U.S. held student loan HEAL debt would not be unconscionable.

Soler currently owes approximately $80,000 on the U.S. loan. Soler's monthly payments on this loan were $662.75 at the time of filing her bankruptcy petition. Interest is accruing at the rate of approximately $529 per month. Soler has not been making monthly loan payments during the pendency of her bankruptcy case. Thus, in order to repay this debt, Soler will likely need to increase the monthly amount she was paying prepetition. If Soler had continued at her prepetition scheduled payment and interest rate, she would have repaid this loan in approximately 22 years. Accordingly, with the WHEAB and USAF loans included in her discharge,[15] Soler should be able to repay this debt in full within her working lifetime without such repayment being unconscionable.

In its answer, the U.S. included a counterclaim seeking a judgment against the debtor for the student loan obligation in the amount of $75,894.82 (the amount owed on September 21, 2000), plus interest. The U.S. also requested an award of its reasonable attorney's fees and costs. Based on the foregoing, I shall grant the counterclaim of the U.S. to the extent of

awarding it judgment in the amount requested, plus interest. The U.S. provided no basis, and find no basis, to award attorney's fees and costs. It also provided no evidence from which attorney's fees could be determined.

### *"Undue Hardship" Under 11 U.S.C. § 523(a)(8)*

Bankruptcy Code § 523(a)(8) provides that the debtor's discharge does not discharge the debtor from debts "for an educational ... loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit ... unless excepting such debt from discharge ... will impose an undue hardship on the debtor and the debtor's dependents." 11 U.S.C. § 523(a)(8).

 Like "unconscionable," "undue hardship" is not defined, but it is generally considered to be a less stringent standard than the unconscionable standard of 42 U.S.C. § 292f(g). *See Rice,* 78 F.3d at 1148–49; *Barrows,* 182 B.R. at 648. In the Eighth Circuit, a totality of the circumstances test is used, based upon the standards set forth by the Eighth Circuit Court of Appeals in *Andrews v. S.D. Student Loan Assistance Corp. (In re Andrews),* 661 F.2d 702 (8th Cir.1981). *See Andresen v. Neb. Student Loan Program, Inc., (In re Andresen),* 232 B.R. 127, 139 (8th Cir. BAP 1999). *Andrews* requires that I examine the totality of the circumstances, "with special attention to": (1) the debtor's current and future "reasonably reliable financial resources"; (2) the debtor's, and her dependents', reasonable, necessary living expenses, and (3) "any other circumstances unique to the particular bankruptcy case." *Andresen,* 232 B.R. at 139–40 (construing *Andrews,* 661 F.2d at 704). Regarding the first and second fac-

---

**15.** *See infra.*

tors, the debtor should demonstrate that she has "done everything possible to minimize expenses and maximize income," and the possibility of changes in the future should also be presented. *See United States Dept. of Educ. v. Rose (In re Rose)*, 227 B.R. 518, 526 n. 11 (W.D.Mo.1998), *aff'd in part, rem'd in part*, 187 F.3d 926 (1999).

### USAF Loan

▮▮▮▮ With the WHEAB loan discharged and the U.S. loan excepted from discharge, Soler is left with student loan obligations totaling over $136,000, approximately $57,000 of which is the USAF loan. The original principal amount of this loan was $52,038, and over the course of eight years, Soler made payments totaling approximately $33,900. The interest rate is fixed at 9.0%, and is accruing in the approximate amount of $415.00 per month. At the time of trial, monthly payments were $467.20 and had been increasing. The monthly payments on her U.S. held loan were $662.75 at the time of filing her bankruptcy petition. If monthly payments (likely in a higher amount that the $467 she was paying) were recommenced, it would take approximately 27 to 30 years for Soler to pay the debt in full, and she would likely need to continue working until at least age 70, if her back condition would allow her to. Even if she were able to continue working this long as a dentist, the evidence shows that she would likely do so while attempting to work through periods of acute back pain.

In arguing that payment of this obligation would not constitute an undue hardship, USAF makes unsupported, speculative assertions like: Soler's expenses are excessive and she could find "several hundred additional dollars each month toward the repayment"; her back condition might improve so that she could work full-time or overtime; "she may be able to obtain more lucrative employment opportunities in a private dental practice"; or, she has a "variety of refinancing options available" (USAF did not explain what any of these alleged options were). However, the evidence presented was overwhelmingly to the contrary. USAF's assertions are mere unsupported speculations belied by the evidence.

As I discussed at length above, Soler has no accumulated wealth. She has done all she reasonably can to minimize expenses and maximize her income. Based upon the evidence presented, I have found that it is extremely unlikely that these conditions will change in the future—though how long she can continue to pay the small amount of rent she is paying for a room in another's house is uncertain, and thus, it is probable that she will need to pay significantly more for housing in the future. She has made a good faith effort to repay her obligation, and she also attempted to reach a workable payment arrangement with the lender, but to no avail. Indeed, the lender's response was that the "obligation is not negotiable," and that her only possible relief would be if she filed bankruptcy and sought to discharge the debt as a hardship.

In *Andresen*, the BAP upheld the bankruptcy court's determination that two of the debtor's three student loans would be discharged as an undue hardship where: the debtor had sustained a severe back injury years earlier and due to her resulting partial disability was unable to find work in Nebraska, conducted a nationwide job search and was hired by a Nevada employer; due to her disability, the court had found that her income would not likely increase in the future; and, any extra income she may receive when her second mortgage was paid off was likely to be negated by the medical needs of one of her

children. *See Andresen,* 232 B.R. at 129, 140–41.

In *Cline v. Ill. Student Loan Assistance Ass'n (In re Cline),* 248 B.R. 347 (8th Cir. BAP 2000), the debtor was a highly educated, healthy, single, 35–year old with no dependents. She worked for the state's Family Services department as a caseworker and earned approximately $25,000 per year. Her student loan obligations were approximately $53,500, and she had made only two payments in a ten-year period. The debtor had obtained a slightly higher paying job on three occasions but each time, she returned to her caseworker position. The bankruptcy court found that the debtor could only handle ministerial tasks, and that she "suffered from the stress of increased responsibility due to a lack of self-confidence." *See id.* at 350. The loan agency offered her an income-contingent plan under which her monthly payments would be $283 for 35 years. On appeal, the bankruptcy court's determination that the debt was dischargeable was upheld. *See id.* at 351. The BAP found no clear error in the bankruptcy court's findings that the debtor's expenses were modest and reasonable, nor in the court's analysis of the debtor's other financial circumstances and her difficulties in functioning in employment positions with higher levels of responsibility. *Id.* at 350–51. Noting that this was a case that could go "either way," the BAP stated it that it would not "second guess" the bankruptcy court's findings, which were not clearly erroneous. *Id.* at 349–51. As to the income-contingent repayment plan offered by the defendant, the court stated that "even under the smallest payment plan, Cline would expend virtually all of her already questionable surplus for thirty-five years to finally repay her student loans," and she would be 70 years old, assuming she had no further financial or health difficulties. *Id.* at 350.

As the court stated in *Andresen,* the legislative history of § 523(a)(8) "demonstrates Congress was concerned about abusive student debtors and protecting the solvency [of] student loan programs . . . ." *Andresen,* 232 B.R. at 137. The evidence here vividly demonstrates that in this case, we have an honest debtor who has made more than a good faith effort to repay her student loan obligations, not an abusive debtor. USAF admitted in its trial brief that "Soler has made a good faith effort to repay her loans . . . ." I find that the debtor has taken all reasonable steps to minimize her expenses and maximize her income. Requiring her to work more hours, at the expense of her back, in order to generate a few more dollars is patently unreasonable. It would also be unreasonable to comb through Soler's expenses searching for every possible spare dollar since the evidence shows she has taken all reasonable steps to minimize her overall expenses and there are certainly no luxury items included in her expenses to reduce. *See Cline,* 248 B.R. at 351. Perhaps by expending virtually all of her surplus income, if any, for the next 27 to 30 years, Soler would be able to finally repay this debt, assuming that she encountered no further financial or health difficulties. However, it is probable that she would be at least 70 years old before she could repay it in full, working this hard for this long would likely cause her further health problems with her back condition, and it would continue to subject Soler to what has been an ongoing, monthly and yearly struggle to cut every corner and go without in order to funnel all possible funds to her student loans. Therefore, having carefully reviewed and considered the evidence, having heard the testimony offered and having examined the totality of the facts and circumstances, I find that except-

ing the USAF loan debt would impose an undue hardship on the debtor.

## CONCLUSION

The nondischarge of the debtor's HEAL loan held by WHEAB would be unconscionable under 42 U.S.C. § 292f(g). However, the nondischarge of the HEAL loan held by the United States would not be unconscionable under 42 U.S.C. § 292f(g). Excepting the USAF loan from discharge would impose an undue hardship on the debtor within the meaning of 11 U.S.C. § 523(a)(8).

## ORDER

THEREFORE, IT IS ORDERED that:

1. The debtor's debt to the Wisconsin Higher Education Aids Board is not excepted from her discharge;

2. The debtor's debt to United Student Aid Funds, Inc., is not excepted from her discharge;

3. The debtor's debt to the United States of America, on behalf of its agency the United States Department of Health & Human Services as Assignee of The Student Loan Marketing Association, "Sallie Mae," arising from those certain promissory notes dated August 29, 1986, August 24, 1987, and June 1988, is excepted from her discharge; and,

4. Defendant United States of America shall recover from the plaintiff the sum of $79,670.47, consisting of $72,580.00 in principal and $3,314.82 in interest which the parties stipulated was owed as of September 21, 2000, plus an additional $3,775.65 in interest accrued from September 22, 2000 through April 26, 2001.

LET JUDGMENT BE ENTERED ACCORDINGLY.