MICHAEL, Circuit Judge,
dissenting:
Todd Smitley, a Chapter 7 debtor who now works as a carpenter, has demonstrated that it would be unconscionable to deny him a discharge of his Health Education Assistance Loan (HEAL) debt. Smitley and his wife have no prospects for increasing their income, and their family’s bare-bones expenses exceed their total income. Smitley’s family will suffer if he is denied a discharge. He will be able to make payments on his HEAL loan only if he neglects some of the essential needs of his family. Accordingly, I respectfully dissent from the majority’s decision to reverse the discharge of Smitley’s HEAL debt.
The HEAL program allows graduate students in the health professions to finance their educations with federally insured loans. See 42 U.S.C. §§ 292, 292o. A HEAL debt may be discharged in bankruptcy, but the debtor must satisfy a strict standard. Discharge requires “a finding by the Bankruptcy Court that the nondis-charge of [the HEAL] debt would be unconscionable.” Id. § 292f(g)(2). The statute does not define “unconscionable,” and I accept the majority’s choice of the following dictionary definitions of the word: “ ‘excessive;’ ‘exorbitant;’ ‘lying outside the limits of what is reasonable or acceptable;’ ‘shockingly unfair, harsh, or unjust;’ or ‘outrageous.’ ” Ante at 116 (quoting Web *125 ster’s Third New International Dictionary 2486 (1993)). This fairly broad definitional range should give a bankruptcy court some latitude in deciding whether to find that nondischarge would be unconscionable. For example, it is easier to find that non-discharge would “l[ie] outside the limits of what is reasonable” than it is to find that nondischarge would be “shockingly unfair” or “outrageous.” Because “what is unconscionable defies precise definition,” one bankruptcy court has “likened [unconscion-ability] to beauty in that it appears to the senses and is found in the eyes of the beholder.” In re Hines, 63 B.R. 731, 736 (Bankr.D.S.D.1986).
In an effort to impose some objectivity, the majority follows other courts and lists a number of factors that a court may consider in conducting the unconscionability analysis. These factors include the debtor’s (1) income, (2) age, (3) health, (4) earning ability, (5) educational background, including professional degrees, (6) prospects for increasing income, including efforts to make that happen, (7) dependents and whether they are able to contribute, (8) accumulated wealth, (9) total HEAL debt (the debtor’s role in accruing the debt, including forbearance requests and payment history, is relevant), and (10) expenses and ability to pay HEAL debt. See ante at 9-10.
I do not quarrel with the majority’s list of factors. The list should be used, however, as a general guide to the examination of the debtor’s overall circumstances and his efforts. As the majority points out, “a court must focus on the ‘totality of the facts and circumstances surrounding the debtor and the obligation.’ ” Ante at 117 (quoting In re Rice, 78 F.3d 1144, 1149 (6th Cir.1996)). Thus, the majority’s list of factors, which is lengthy, should not be used to reduce the unconscionability analysis to some rigid, formula-driven calculation. This is because the unconscionability determination is an equitable one. In the end, the debtor’s good faith, or lack of it, must count for a lot. See In re Rice, 78 F.3d at 1150 (“[W]e believe the debtor’s good faith to be an appropriate and necessary consideration” in the unconscionability determination). When I conduct the de novo review in this case, applying essentially the same standards as the majority, I come to a completely different conclusion: it would be unconscionable to deny Smitley a discharge of his HEAL debt. I will explain why, starting with the factors listed by the majority.
(1) Income. Smitley and his wife have a combined gross income of about $42,000 ($37,000 net of taxes). The majority counts this annual income level against Smitley, stating that “repayment of the HEAL loan would not force the family to maintain a standard of living below or even near the poverty level.” Ante at 122 (citing Annual Update of HHS Poverty Guidelines, 65 Fed.Reg. 7555 (Feb. 15, 2000) (quotation marks omitted)). Because the poverty threshold marks a point of desperation, I would not use the federal poverty guidelines to gauge when it becomes unconscionable not to discharge a HEAL debt. Recent studies indi *126 cate that the method currently used by the federal government to set poverty levels is “conceptually insufficient for measuring the basic income needs of a working family.” Jared Bernstein et al., How Much Is Enough? 1 (Economic Policy Institute, 2000) (see also studies cited therein); Measuring Poverty: A New Approach (Constance F. Citro & Robert T. Michael eds., National Academy Press, 1995) (proposal by National Research Council for developing new approach to official poverty measure in U.S.). A study commissioned by the Economic Policy Institute concludes that the average family requires income of twice the government-set poverty figure in order to maintain “a safe and decent standard of living.” Bernstein et al., swpra, at 1, 64. In 2000, shortly before Smitley’s trial, poverty level income for a family of six (the size of the Smitley family at the time) was $22,850. Doubling that to reach the “safe and decent” level would require $45,700, or $3,700 more than the Smitleys made. The Smitleys are definitely short of the income necessary to reach the minimum safety level, for they cannot afford health insurance. The Smitleys’ $42,000 gross income level is not adequate by any reasonable standard, and it should weigh in favor of discharge.
(2) and (3). Age and health. Smitley was 47 years old at the time of the trial, so he has a good many years of earning capacity left. Smitley testified that his health is good, but he said that he had not had a physical examination for seven years. Smitley had a serious medical problem a few years ago when he ruptured an artery in his leg and was hospitalized for ten days. He did not return to full-time work for six weeks, and his uninsured status left him with $22,000 in medical bills that he had to pay. A comparable health problem in the future would likely send the Smitleys back into bankruptcy.
(4) (6). Earning ability; education; prospects and efforts for increasing earnings. The majority notes that “Smitley and his wife have stable employment” and weighs this against discharge. Ante at 122. Stable employment should not be an automatic penalty. As a general rule, it shows good faith and a sense of duty. What is more important is the earnings total (which I have already discussed) and whether sufficient effort has been made to increase the total. As for Mrs. Smitley, who works as a dental assistant, the bankruptcy judge found that “she has no real prospect for advancement” in her employment. Moreover, the majority accepts that Mrs. Smitley cannot work more than the weekly total of 30 to 35 hours she puts in at two part-time jobs. Ante at 123- n. 11. She cannot do more as a result of a hand problem that has not been diagnosed or treated because she cannot afford to see a doctor.
As for Smitley himself, the majority concludes that he “has not made substantial job search efforts” to find a position more appropriate to his level of education or to find part-time work to supplement his current wages. Ante at 122. This conclusion, which is key to the majority’s decision, runs head-on into the bankruptcy judge’s finding that Smitley has no prospects for improving his employment situation. Spe *127 cifically, the judge found that Smitley “is probably underemployed as a carpenter, but he has no prospects for other employment.” (emphasis added). Because this finding is not clearly erroneous, it cannot be set aside. Fed. R. Bankr.P. 8013. Nor can it be ignored.
Smitley once held a certificate to teach in secondary schools, but his certificate lapsed more than twenty years ago. His chiropractor’s license expired in 1999 because he could not afford to enroll in the required seminars for continuing education. Now, Smitley cannot afford the courses necessary to prepare for the state board examinations that would be a prerequisite for the reinstatement of his chiropractor’s license. Thus, although Smit-ley’s prior education as a teacher and a chiropractor make it appear that he is now underemployed in his job as a finish carpenter, the bankruptcy judge was correct in not holding this against him. Smitley simply lacks the money to be retrained and relicensed in his prior professions.
The majority concludes that even if Smitley cannot market himself as a licensed professional, he did not make substantial’ efforts to find either a better job or a supplemental part-time job. See ante at 123-124. I respectfully suggest that the record shows that Smitley has made an adequate, albeit unsuccessful, effort to find better work or more work and that the bankruptcy judge’s finding that he “has no prospects for other employment” is fully supported. First, Smitley registered with two employment agencies and followed up with inquiries. Second, he sought evening and part-time jobs with several grocery stores and retailers, including Target and Kmart. Third, he applied with Cisco Systems and got an encouraging response until the company imposed a hiring freeze. Fourth, he applied to several technical schools and colleges, including one out-of-state college, for teaching positions in the science and health care areas. Fifth, he told his current employer that he needs more hours. Sixth, he talked with members of his church who are in management positions, letting them know that he is looking for a better job. Finally, at the time of the trial he was still actively looking for a better position or part-time work. This effort, though wholly unsuccessful, is sufficient to support the bankruptcy judge’s finding that Smitley has no real prospects for a better job. In short, Smit-ley’s job search has been earnest and adequate, and his lack of success should not be held against him.
(7) Dependents and whether they are able to contribute to their support. The Smitleys have five children, four of whom were dependents on the date of the trial, April 12, 2001. The oldest of the dependents, twin daughters who were seventeen (juniors in high school) on the date of trial, worked part-time to pay for their activities. The other two dependents are a son who was around thirteen at trial time and a daughter who was around seven. The son should be old enough by now to find some way to contribute.
(8) Accumulated wealth. The Smitleys have no savings or investments, and they do not own a home. Mrs. Smitley has a $10,000 retirement account funded by employer contributions.
(9) Total HEAL debt; forbearances and payment history. Smitley’s total HEAL debt is $63,000, with interest currently accruing at the rate of 8.25 percent per year. I cannot argue with the majority’s statement that “Smitley bears responsibility for the [HEAL] debt’s escalation from the original $27,000” because he “received for-bearances for almost two years” and “then paid only $100 per month.” Ante at 123. Forbearances and small payments do not automatically prevent a debtor from obtaining the discharge of a HEAL debt, *128 however. See, e.g., In re Soler, 261 B.R. 444, 450 (Bankr.D.Minn.2001). What is important is whether the forbearances and small payments were justified. They were justified in Smitley’s case because, despite reasonable efforts on his part, his chiropractic practice floundered for thirteen years and finally folded. During this time Smitley and his wife had to support five children. The majority indicates that the size of Smitley’s HEAL debt might have been smaller if the Smitleys had not been so generous with their contributions to their church for three years (1995-1997) when they made annual contributions of between $8,000 and $5,800. See ante at 123 n. 12. I would not hold these contributions against Smitley. The Smitleys have not lived extravagant lives, and they no longer contribute to their church. Indeed, in recent times they have had to rely on the charity of members of their church, who have given the Smitleys money to help meet expenses.
(10) Expenses and ability to pay HEAL debt. The majority says that Smitley’s financial situation has improved because he has received a discharge of other debts. Yet the reduction of Smitley’s accumulated debt burden does not tell us very much about whether he can afford to make monthly payments of $827 against the HEAL debt for the next twenty-five years. We have to look at the family’s income and its reasonable expenses to determine Smit-ley’s ability to pay. The Smitleys’ income net of taxes is about $37,000 a year, or about $3,100 a month. The family has monthly living expenses — all of which appear to be reasonable — of about $3,700, or $600 in excess of income. Their living expenses include rent ($1,250), utilities ($340), car payment ($434), delinquent tax payments ($300), insurance ($93), clothing ($100), food (approximately $600), gasoline (approximately $200), and medical expenses ($355). The majority challenges these expenses by saying that as Smitley’s children reach age eighteen, he “could at least reduce his monthly shelter and transportation expenses.” Ante at 124. Although the twin daughters are now over eighteen, there is not much room for a reduction of these expenses. If the twins have moved out of the home, it would be reasonable for the Smitleys to retain the three-bedroom house so that the two remaining children could have separate bedrooms. Even if the twins are still at home and working, it is not realistic to expect that they are a long-term solution to reducing the Smitleys’ expenses for shelter. And, while the fact that the twins have reached majority might have brought a marginal reduction in Smitley’s transportation expenses, I doubt that this reduction would do much to make up the $600 gap between total expenses and available revenue. Simply put, the Smitleys do not have the extra money to pay $327 a month against the HEAL loan.
(11) Good faith. I sense that the majority has decided that Smitley has not tried hard enough; specifically, he did not try hard enough to pay down the HEAL loan while he had his chiropractic office open; he has not tried hard enough to find a better job or to find part-time work; and he has not tried hard enough to reduce family living expenses. Effort and good faith are important to be sure, and I believe that Smitley has exhibited both in sufficient measure.
Smitley went to chiropractic school, using a HEAL loan, in order to do better for himself and his family. After graduating in 1986, Smitley struggled for thirteen years to make a go of it as a chiropractor. Much went wrong. He attempted to get started in his new profession by buying another chiropractor’s practice. Smitley bought what he thought was a thriving practice, but it proved to be a marginal *129 venture from the very start. Many of the patients switched to other chiropractors, and Smitley did not have the capital to do extensive advertising. Smitley labored for five or six years to build what might have been a decent practice. Indeed, in the early part of the 1990s his practice actually “piek[ed] up” for a time, and it looked as though Smitley might finally achieve success. Then, he was caught simultaneously by hard luck and structural change in the health care industry. A fire destroyed “almost everything” in Smitley’s office. Not long after the fire, he ruptured an artery in his leg, was hospitalized, and lost nearly two months of full-time work. At about the same time, the advent of health maintenance organizations and preferred provider organizations cut into Smitley’s patient base. According to Smitley, he could only afford the fees to participate in two HMOs. Smitley struggled along in his practice for awhile longer, and before it failed entirely, he began supplementing his income with part-time finish carpentry work. Finally, one day in late 1999, he went to the office and found that the electricity had been turned off (he could not afford to pay the utility bill). That was the day Smitley closed his practice.
The Smitleys have a lifestyle that is quite modest. They live in a rented house (for several years seven family members were crowded into their three-bedroom rental). They always buy used cars, and they do not take vacations. Most of the time they buy their clothing on credit. Smitley and his wife cannot afford health insurance. Their children have health insurance through a state public assistance program. The twin daughters did not get driver’s licenses because the Smitleys could not afford the extra auto insurance premiums required to cover young drivers. The Smitleys have no savings, and their three older children are not going to college. In 1999 Smitley cashed in his life insurance policy and applied the $9,500 in proceeds to pay the family’s bills. Both Smitley and his wife have worked steadily, and they have managed to provide just the basics for a large family. I believe they have acted in good faith.
* * *
The examination of the relevant factors reveals that the majority makes three fundamental mistakes in concluding that it is not unconscionable to deny Smitley a discharge of his HEAL debt. First, the majority relies too much on the poverty guidelines in denying the discharge. Requiring Smitley to repay the HEAL loan, the majority says, will not force the Smit-leys to live below or even near the poverty level. The uneonscionability threshold, however, is crossed well before the poverty line is reached. A family requires double the poverty guidelines figure to maintain a decent standard of living, and the Smit-leys’ income is short of the required level. Second, the majority concludes that Smit-ley has not made substantial efforts to find a better job or a part-time job that would supplement his current income. This conclusion is foreclosed by the bankruptcy judge’s finding that Smitley “has no prospects for other employment.” It is thus established as a fact that Smitley has no prospects for increasing his income. The same goes for Mrs. Smitley. Third, the majority suggests that Smitley could somehow reduce the family’s living expenses. As the bankruptcy judge found, the Smitleys’ “monthly expenses exceed their monthly income.” The Smitleys’ expenses are bare bones, covering mainly the essentials such as rent, utilities, food, clothing, and transportation. The expenses would have to be cut about ten *130 percent to make room for a monthly HEAL debt payment of $327. An expense cut of that size would push the Smitley family’s budget to the breaking point and deprive the family of any chance for a decent standard of living. Already, Smit-ley and his wife cannot afford health insurance. What else will the Smitleys have to do without to make payments on the HEAL loan? Will they have to move to a two-bedroom house, depriving their young son and daughter of separate bedrooms? To save on utility costs, will they have to turn down the thermostat to the point of discomfort when the weather gets cold? Will they have to reduce their modest expenses for food and clothing? Cuts like these will have to be made for Smitley to make payments on the HEAL debt. That result will, I believe, be detrimental to the stability and well being of the Smitley family.
Todd Smitley has acted in good faith, and the other relevant factors establish that his family is barely getting by. It would be unconscionable to push Smitley any further and unconscionable not to discharge his HEAL debt. Because the majority reverses the discharge and reinstates the HEAL debt, I respectfully dissent.